IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ERNESTO LIRA,

        Plaintiff,

v.

DIRECTOR OF CORRECTIONS, et. al.

        Defendants.

No. C-00-0905 SI

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On February 29, 2008, the Court held a hearing on defendants' motion for summary judgment. After consideration of the parties' papers and arguments, the Court DENIES defendants' motion in part and GRANTS in part.

**BACKGROUND**

**I.    Procedural background**

This case returns to the Court after remand. Plaintiff Ernesto Lira filed this originally *pro se* suit under 42 U.S.C. § 1983 challenging his placement in administrative segregation ("Ad Seg") while at Deuel Vocation Institute ("DVI"), and later in a Special Housing Unit ("SHU") at Pelican Bay Prison. Prison officials placed Lira in Ad Seg and the SHU because he was "validated" as an associate of the Northern Structure prison gang. Lira alleges that his due process rights were violated because there was not sufficient, reliable evidence to support this "validation," and because he was denied meaningful opportunities to challenge the validation.

In an order filed in May 2002, this Court granted defendants' motion for summary judgment on the ground that the sole remaining cause of action encompassed both a fully exhausted claim and some unexhausted claims. This Court noted that it was undisputed that Lira had only exhausted administrative remedies with respect to a 1996 grievance, and that the 1996 grievance "was limited to his placement in ad seg" and "did not challenge the propriety of any of the periodic reviews that occurred after the grievance was filed." May 15, 2002 Order at 5-6. This Court concluded that Lira failed to meet the exhaustion requirement of 42 U.S.C. § 1997e(a), and dismissed the case without prejudice.

The Ninth Circuit reversed and remanded, holding that § 1997e(a) did not require dismissal of an entire action where a prisoner's complaint contains exhausted and unexhausted claims. *See Lira v. Herrera*, 427 F.3d 1164 (9th Cir. 2005). Instead, the Ninth Circuit instructed that the proper treatment of a "mixed" complaint depends on the relatedness of the claims. If the exhausted and unexhausted claims are interrelated, the district court should dismiss the complaint and allow the plaintiff the opportunity to amend the complaint to excise the unexhausted claims; if the claims are not interrelated, the court should dismiss the unexhausted claims and allow the case to proceed.

With respect to Lira's case, the Ninth Circuit stated:

> The district court's dismissal of Lira's case turned on its implicit, but not fully discussed, interpretation of Lira's complaint as presenting *multiple* claims regarding his validation as a Northern Structure gang member. It correlated the number of grievances filed within the California prison system with the number of claims within his complaint, and therefore did not regard his complaint as presenting a single due process claim challenging the unavailability of the evidence used against him and resulting in his placement and retention in administrative segregation.

The Ninth Circuit noted that Lira, now represented by counsel, challenged "a constellation of due process violations for his validation as a gang associate and his placement and retention in the administrative segregation at [DVI] and the SHU at Pelican Bay" that amounted to a *single*, exhausted claim. *Id.* at 1177 (emphasis in original). The Ninth Circuit noted that "[a]lthough there is force to Lira's argument, we leave it to the district court to consider this new characterization of Lira's due process claim in the first instance." *Id.* at n. 13.

On remand, the Court granted plaintiff's motion to file a first amended complaint that alleged a single due process claim challenging his validation as a gang associate and his placement and retention

2

1 in ad seg and the SHU – essentially, the "constellation" of due process violations referred to in the Ninth
Circuit's decision.

## II. Factual background

Plaintiff is currently a parolee under the custody of the California Department of Corrections and Rehabilitation (CDCR). Plaintiff is scheduled to be discharged from CDCR's custody on March 9, 2008. It is undisputed that plaintiff was validated as a member of the Northern Structure prison gang in 1993 while he was out on parole. The parties dispute whether plaintiff was notified and/or interviewed in connection with the initial gang validation; plaintiff states that he was never notified of defendants' investigation into his alleged gang affiliation, and that the first time he learned of his gang validation was in 1995 when he returned to prison after a parole violation (and subsequent conviction).

### A. Initial gang validation in 1993 at Sierra Conservation Center

In 1991, plaintiff was convicted for petty theft and received a two year sentence. On August 13, 1992, plaintiff was incarcerated within the CDCR at Sierra Conservation Center. Defendants state that while plaintiff was housed at Sierra, "Assistant Institutional Gang Investigator Smith received notification and supporting documentation that plaintiff was associated with the Northern Structure Prison gang." Motion at 3-4. At their deposition, neither Smith nor Smith's supervisor, Institutional Gang Investigator ("IGI") Covello, could remember what supporting documentation Smith received. Feudale Decl., Ex. C at 39:10; White Decl., Ex. FF at 12:5. Covello testified that if documentation was sent, "it would have to either be a 128 of some sort, or it could have been a confidential report with no other corroboration." Feudale Decl. Ex. C at 39:11-14. Based on that information, Smith began investigating plaintiff's potential involvement in the Northern Structure prison gang.

In the course of that investigation, Smith found three pieces of evidence that were used to validate plaintiff as a gang member: (1) a drawing found in plaintiff's locker at Sierra; (2) an April 24, 1992 incident report describing an incident with plaintiff and several Merced County Jail inmates identified as "Surenos"; and (3) a September 25, 1992 debriefing report in which a confidential informant lists plaintiff as an active associate of the Northern Structure gang. On April 4, 2000, during

1 a review of plaintiff's gang associate status, a fourth piece of evidence was added to plaintiff's central
2 file – a confidential debriefing report dated April 1, 1998 which identified plaintiff as engaging in gang
3 activity within the past six years. Each of these pieces of evidence, and plaintiff's challenge to the
4 evidence, is discussed below.

**(1)    Drawing**

As part of his investigation, Smith spoke with Officer Gordon and requested that he search plaintiff's locker. Officer Gordon searched plaintiff's locker and discovered a drawing with many illustrations on it. Feudale Decl. Ex. F. Gordon testified in his deposition that after the search, plaintiff confronted Gordon about the search, admitted to creating the drawing, and asked for its return. Gordon Depo. 28:14-24; 56:25-57:5. However, plaintiff disputes that he admitted to drawing the picture, and has submitted evidence that the drawing was created by another inmate.

After Gordon gave the drawing to Smith, Smith told Gordon that the drawing contained several gang symbols, notably the number "14" and the "Northern Star," as well as the name "Chino," which defendants assert is plaintiff's moniker. According to defendants, the Northern Star, the number "14," and the "Huelga bird," which is also contained in the drawing, have been identified by numerous gang investigators and gang experts within the CDCR as being associated with the Northern Structure prison gang.

Plaintiff challenges the use of the drawing as evidence of his gang affiliation. Plaintiff notes that during the course of discovery, the drawing was shown to numerous CDCR personnel, including a number of professed gang experts, and that few could find the number "14" unaided, no one could find the "Northern Star," and several were able to point out the Huelga bird, but admitted that it is a common symbol in Hispanic culture and has been used as an insignia for such groups as the United Farm Workers. Plaintiff has also submitted the declaration of inmate Freddie Leyba in which Leyba confirms that he made the drawing. White Decl. Ex. B. Leyba describes the drawing as just sketches of some thoughts and asserts that he "did not intend to put any prison gang symbols in the drawing." *Id.* Leyba states that the number "14" the picture was "just intended to mean Norteno, a Northern Hispanic, which is what I was an am," and that "there is no Northern Star in the drawing." *Id.* Leyba also states that he

4

**United States District Court**
For the Northern District of California

1 made the drawing before he met plaintiff, and thus the supposed reference to "Chino" in the drawing
2 could not refer to plaintiff. *Id*.

### (2) April 24, 1992 jail yard incident report

The second piece of evidence used to validate plaintiff is a report concerning an incident on April 24, 1992 involving plaintiff in the yard of the Merced County Jail when plaintiff was housed there. As part of his investigation, Smith contacted Officer Romero of the Merced County Sheriff's Department to determine if Merced County had any evidence of plaintiff's gang activity. Officer Romero provided Smith with a "late entry" typed incident report, dated April 13, 1993, recounting the events that occurred on April 24, 1992. The typed incident report states, *inter alia*:

> AT THE PRESENT TIME AND CURRENTLY, 3 BLOCK HOUSES THE MAJORITY OF NORTHERN STRUCTURE, NUESTRA FAMILIA AND LOCAL NORTHERN HISPANIC STREET GANG MEMBERS. AS 3 BLOCK CAME INTO THE YARD THE FOLLOWING GANG MEMBERS GROUPED TOGETHER AND STARTED TO SCAN THE YARD. THE INMATES WERE, LIRA, ERNESTO GEORGE, AKA "CHINO," DOB 010664 CDC # C60918 NORTENO, M14 ASSOCIATE/NORTHERN STRUCTURE MEMBER AND NF ASSOCIATE, MORALES, JUAN AKA "PULGA" DOB 021866 CDC # 002845 [and other individuals]
>
> THESE INMATES GATHERED TOGETHER AND STARTED TO GO OVER TO PAMONA 13 [and other individuals]. AS I SEEN THEM STARTING TO WALK TOWARDS THEM I CALLED OTHERS [sic] OFFICERS THE YARD FOR A POSSIBLE GANG FIGHT. BY THE TIME THE OFFICERS ENTERED THE YARD, THE NORTHERN GANG MEMBERS WERE HUDDLED AROUND THE SOUTHERN GANG MEMBERS WITH CLINCHED FIST, QUESTIONING THEM ABOUT THEIR TATTOOS AND WHERE THEY'RE FROM. THE TWO MAIN INMATES THAT WERE DOING THE MOST QUESTIONING AND INTIMIDATING WERE MORALES . . . AND LIRA. . . . THE OFFICERS BROKE UP THE CROWD AND TOOK THE TWO "SURENOS" OFF THE YARD. LIRA THEN LOOKED UP AT ME AND SAID "COME ON ROMERO, ALL WE WANTED TO DO WAS PLAY WITH THEM A LITTLE WHILE. YOU KNOW WHEN WE GO TO THE 'PEN' THEY (MEANING SURENOS) RUSH US FROM THE GATE."

White Decl. Ex. C. Defendants state that numerous gang investigators and high ranking prison administrators have relied on this report as indicating plaintiff's gang activity.

Plaintiff argues that the report is unreliable for numerous reasons. First, plaintiff notes that the typed report was prepared a year after the incident, and specifically in response to Smith's request for any gang-related information related to plaintiff. In contrast, a handwritten report prepared by Romero the day after the incident is significantly different, and less detailed. The original handwritten report

5

lists Lira as one of eight inmates involved in the incident, and states, in relevant part,

> The larger group of "Nortenos" gathered on the East side of the yard, all of them staring at the "Surenos" on the West side of the yard. At this time Hernandez & Morales started to tie their shoes, that's when I knew something was going to go down. They all then started walking toward the "Surenos" looking at me and then at the "Surenos." I got on the radio and called the officers back to the yard for a possible Group 415. By the time the officers got to the yard, the "Nortenos" were in the "Surenos" face with clinched fist. The officers broke up the crowd and I directed them to remove the "Surenos"off of the yard.

*Id*. The handwritten report does not record any statements made by plaintiff to Officer Romero.

After he learned he was validated, plaintiff secured a letter dated March 8, 1998 from Officer Romero to CDCR which states,

> IN CHECKING WITH THE CLASSIFICATION DEPARTMENT, WE CANNOT FIND ANY GANG VALIDATION ON ERNESTO LIRA IN MERCED COUNTY JAIL. LIRA IS ALWAYS HOUSED IN GENERAL POPULATION WITH OTHER NORTHERN HISPANICS, WHICH IS THE MAJORITY OF OUR JAIL. I HOPE THIS LETTER WILL HELP CLARIFY ANY MISUNDERSTANDING THAT YOU MIGHT HAVE.

*Id*. Ex. D. Plaintiff submitted this letter in the course of his administrative challenges to his gang validation, but as set forth below, plaintiff's gang validation was never rescinded.

Finally, both sides have submitted competing declarations from Officer Romero regarding the April 24, 1992 incident. The declaration submitted by plaintiff states, *inter alia*, that up through April 24, 1992, Merced County did not have any evidence that plaintiff was a prison gang member or associate and that plaintiff was a Norteno (an inmate of Mexican heritage from Northern California) and housed with all Nortenos, whether or not they were members or associates of any street gangs, any prison gangs, or were just Mexicans from Northern California. October 5, 2007 Romero Decl. ¶¶ 2-8 (White Decl. Ex. E). Romero's October 5, 2007 declaration also states that Romero did not see Lira do anything that indicated he was trying to instigate a fight, and that Romero "couldn't say that Lira was trying to start trouble [and] can't say that Lira was a problem maker at that incident." *Id*. ¶¶ 16, 18. Romero further states "I didn't think Lira was a gang banger. That's why I agreed to write my March 8, 1998 letter." *Id*. Romero also states that "I think the CDC officers may have misconstrued the information in my April 13, 1993 typewritten report. The identifying comments about Lira, starting on line 8 of paragraph 2, end with the words "M-14 associate," followed by the diagonal slash mark. M-14 is a street gang in Merced." *Id*. at ¶ 31.

The declaration submitted by defendants states, *inter alia*, that on the day of the incident in question, "[t]he two inmates who I observed doing the most questioning and intimidating were Mr. Lira and Juan Morales, a validated Northern Structure prison gang member." February 14, 2008 Romero Decl. ¶ 4. This declaration repeats the statement that Lira allegedly made to Romero (as stated in the April 1993 typewritten report). *Id*. ¶ 6. Romero also states that his October 5, 2007 declaration "was not intended to disavow or deny any of my observations on April 24, 1992. I still believe that Mr. Lira's actions on April 24, 1992 in associating with validated gang members, questioning and intimidating South Hispanic gang members, and making the statement he made to me were indicative of gang activity." *Id*. ¶ 9.

### (3) September 25, 1992 debriefing report of confidential informant

Smith also received a debriefing report dated September 25, 1992. Feudale Decl. Ex. N. In the debriefing report, a confidential informant who purportedly wanted to leave the Northern Structure gang identifies plaintiff on a list of active associates and members of the Northern Structure. *Id*. at 11. The twelve-page long report contains numerous details about the Northern Structure gang and various supposed gang members, but does not contain any information about plaintiff aside from including his name on a list of individuals and their gang status. Defendants state that the report is reliable because members of the Northern Structure are required to memorize information about inmates in good and bad standing with the gang. Defendants also argue that the report is reliable because the informant incriminated himself in providing the information, some of the information provided had already proven to be true at the time the report was prepared, and part of the information provided had been previously supplied by an independent source. *Id.*

Plaintiff argues that the report is not reliable because it does not contain any information about Lira aside from his inclusion on a "laundry list" of gang associates. Plaintiff notes that because of the inherent unreliability of such "laundry lists," in 2005 the CDCR amended its regulations governing prison gang validation and discontinued using such lists for validation. While the amended regulations are prospective in effect, plaintiff argues that nevertheless the amendment shows that the debriefing

7

report is inherently unreliable. Furthermore, because inmates are not given their *Miranda* warnings before being debriefed, plaintiff contends that self-incrimination would not even be a possibility.

### (4) April 1, 1998 confidential inmate debriefing report

In April 2000, defendant Fielder reviewed plaintiff's gang validation status. Fielder noted that a confidential debriefing report dated April 1, 1998 was placed in plaintiff's file. The report identifies plaintiff as engaging in gang activity, including assaulting his cellmate for gang-related reasons and sending a threatening letter to the informant's mother. Feudale Decl. Ex. I I. Defendants argue that this report is reliable for the reasons set forth in Robert Marquez's declaration, filed under seal. In addition, the informant had previously provided information which proved to be true, other confidential sources had independently provided the same information, the informant incriminated himself in providing the information, and some of the information provided had already proven to be true at the time the report was prepared.

Plaintiff argues that the report is unreliable because it does not name the inmate plaintiff allegedly assaulted or provide the date or time frame of the assault. Pelican Bay SHU cellblock activity logs for October 7, 1997, include a reference to plaintiff fighting with a newly assigned cellmate, Anthony Ramirez. White Decl. Ex. H. However, other CDCR records reveal that no assault occurred on that occasion. Plaintiff asserts that Ramirez, who has a history of behavioral problems in prior cellmate assignments, began acting erratically and threatened to damage plaintiff's possessions, and when plaintiff complained to the guards, Ramirez was led away. Plaintiff notes that a form 115 disciplinary report was generated over the incident,[1] but that the report reflects no evidence of physical violence or disciplinary violation cited against plaintiff. Furthermore, plaintiff argues that it is implausible that he mailed a threatening letter from prison because inmate mail at Pelican Bay was closely screened for gang-related communications at the time plaintiff allegedly sent the threatening letter.

After receiving the first three documents described above, Smith prepared a "gang validation package" containing these documents for review by IGI Covello. Covello reviewed the package and

---

[1] CDCR never produced the form 115 report during the course of this litigation.

8

determined that it met the criteria required for submission to the Special Services Unit in Sacramento. Neither Smith nor Covello remembers speaking with plaintiff regarding his validation prior to submitting the validation package for review with the Special Services Unit. Plaintiff states he was never told by anyone that he was being investigated. Covello testified in his deposition that inmates were routinely interviewed prior to the submission of their gang validation package. However, he could not recall if Lira had been interviewed and there is no evidence in the record that plaintiff was afforded such opportunity.

On May 14, 1993, plaintiff was released on parole. On June 22, 1993, the gang validation package was received by the Special Services Unit for review. Defendant Olson, a Special Agent in the Special Services Unit, determined that the validation package was sufficient to meet the Departmental validation requirements, and validated plaintiff as an associate of the Northern Structure prison gang.

### B. Review of plaintiff's gang validation at Deuel Vocational Institution, 1995-1996

On February 25, 1995, plaintiff was arrested for violating provisions of the California Health and Safety Code. Feudale Decl. Ex. Q. On March 29, 1996, plaintiff was found guilty and sentenced to a prison term of eleven years for violating Health and Safety Code Sections 11379 (sale/transportation of controlled substances) and 11377(a) (possession of controlled substances). *Id*. Ex. R. On October 31, 1995, after his arrest but before his conviction, plaintiff's parole was revoked and he was sent to the Deuel Vocational Institution's reception center. *Id*. Ex. B. On December 27, 1995, defendant Olmstead received information from defendant Fielder of the Investigative Services Unit at Deuel that plaintiff was a validated associate of the Northern Structure prison gang. Fielder Decl. ¶ 5; Olmstead Decl. ¶ 5(a).

On December 28, 1995, defendant Herrera provided plaintiff with an "Order for Hearing and Placement in Segregated Housing" (CDCR Form 114-D). Herrera Decl. Ex. A. The order notified plaintiff that he was being retained in Ad Seg because he was a validated associate of the Northern Structure prison gang and his presence in the general population was "a threat to the safety of staff and inmates alike, and to the security of the facility." *Id*. Plaintiff states that this was when he first learned that he had been validated as a Northern Structure gang associate.

On January 4, 1996, plaintiff appeared before the Deuel Vocational Institution Institutional Classification Committee (ICC) for a review of his placement in Ad Seg. The hearing included defendants Alameida, Busser and Chavez. Plaintiff voiced his concern over having been validated as a gang associate and asked to see the evidence used to validate him. Defendants say they informed plaintiff of the reasons he was placed in Ad Seg, but they did not have his Central File. Because the committee did not have plaintiff's Central File to review at the time of the hearing, the ICC elected to retain plaintiff in Ad Seg pending receipt of his file to review for evidence of prison gang membership.

On February 8, 1996, the ICC, comprised of defendants Chavez, Busser and Schmidt, conducted a thirty-day review of plaintiff's placement in Ad Seg. Plaintiff was not present at the hearing because he was in Merced County for unrelated court proceedings. The ICC decided to retain plaintiff in Ad Seg because "information had been received that plaintiff was a validated associate of the Northern Structure." On February 29, 1996, plaintiff returned to Deuel following his court appearance in Merced County. Plaintiff was provided with an "Order for Hearing and Placement in Segregated Housing" which, like the previous Order, informed plaintiff that he was retained in Ad Seg because prison records indicated that he was a validated associate of the Northern Structure prison gang.

On March 7, 1996, April 4, 1996, June 27, 1996, July 15, 1996, and August 22, 1996, plaintiff appeared before the ICC for thirty-day reviews of his Ad Seg placement. The committees included defendants Chavez, Busser, Schmidt, Mann and Pizzella. At each hearing, the ICC decided to retain plaintiff in Ad Seg due to his validation as a gang associate.

Plaintiff asserts that at the March 7, 1996 hearing, plaintiff presented a CDCR form 602 inmate appeal, in which he requested the evidence supporting his validation. No action was ever taken on plaintiff's appeal, and CDCR later told him they had to record of it. In June of 1996 plaintiff's Central File arrived at DVI and he was shown summary descriptions[2] of the evidence used to validate him. On July 29, 1996, plaintiff filed another 602 appeal. He was interviewed by defendant Darlene Best (now Pizzella) regarding his appeal about a month later. Best denied his appeal on the ground that "staff believe[d] [he was] an associate member of this prison gang." White Decl. Ex. W. On September 4, 1996, Olson re-validated plaintiff as a gang associate using the first three above-mentioned pieces of

---

[2] These summaries were in the form of 128B chronos.

10

1 evidence. On September 23, 1996, plaintiff was transferred to Pelican Bay SHU, where he spent the next eight years.

### C. Review of plaintiff's gang validation at Pelican Bay 1996 - 2004

While at Pelican Bay, plaintiff appeared before Unit Classification Committees every 180 days. On April 4, 1998, plaintiff submitted another inmate appeal challenging the items used to validate him. Feudale Decl. Ex. AA. In this inmate appeal, plaintiff attached the letter drafted by Officer Romero, which stated that Merced County Jail authorities did not have any evidence that plaintiff was a gang member. Officer Piland was assigned to review the appeal, and after guidance from SSU in Sacramento, Piland denied plaintiff's appeal at the first level. Plaintiff renewed his appeal at the Warden's level and was again denied. White Decl. Ex. X.

### LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T. W. Elec. Service, Inc.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). The evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving

11

papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.      Liberty interest and due process**

A liberty interest may arise from either of two sources: the due process clause itself or state law. *Hewitt v. Helms*, 459 U.S. 460, 466 (1983), *rejected on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). State law creates a liberty interest if it substantively limits official discretion by establishing particularized standards or criteria that govern state decision-makers. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989). The liberty interest at issue here is the interest of prisoners in remaining in the general prison population and not being confined in a security housing unit. In *Toussaint v. McCarthy*, 801 F.2d 1080, 1097-98 (9th Cir. 1986), the Ninth Circuit held that sections 3335(a) 3336, and 3339(a) of Title 15 of the California Code of Regulations, taken together, create a constitutionally protected liberty interest to be free from placement in Ad Seg. Because confinement in segregated housing may implicate a liberty interest, prisoners must be provided the procedural due process required by the Constitution before confinement. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1271 (N.D. Cal. 1995).

A prison inmate who is investigated and confined to Ad Seg on account of validation in a prison gang is entitled to minimal procedural protections: (1) an opportunity to present his views to the IGI when he is under investigation, before the validation is confirmed; (2) an informal non-adversarial hearing within a reasonable time after segregation; (3) notice of the charges or reasons for segregation; and (4) a meaningful opportunity to present his views during post-validation reviews. *See Toussaint*, 801 F.2d at 1100; *see also Guizar v. Woodford*, 2007 WL 951294 (N.D. Cal. Mar. 27, 2007); *Jones v. Gomez,* 1993 WL 341282 (N.D. Cal. Aug. 23, 1993).

Due process also requires prison officials to have an evidentiary basis for their decisions to confine an inmate to a security housing unit, whether the purpose of that segregation is disciplinary or administrative. *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985). In order to validate an inmate as a prison gang member, CDC regulations require that IGIs identify at least three "original,

1  independent source items of documentation indicative of association with VALIDATED gang members
2  and/or associates."[3] DOM § 55070.19.3. (emphasis in original); *Madrid*, 889 F. Supp. at 1242. Once
3  the IGI believes there is sufficient documentation to validate an inmate, the IGI prepares a "validation
4  package" for submission to the Special Services Unit in Sacramento for review. *Id.* Due process
5  requires that such decisions be supported by "some evidence." *Id.*; *Toussaint*, 801 F.2d at 1103-06.
6  This standard is only "minimally stringent," and the relevant inquiry is whether there is any evidence
7  in the record that could support the conclusion reached by the prison decision-makers. *Cato v. Rushen*,
8  824 F.2d 703, 705 (9th Cir. 1987).

Furthermore, the Ninth Circuit has held that, in the context of prison disciplinary proceedings, the information relied upon must also have at least "some indicia of reliability." *Id.* at 705 (citing *Mendoza v. Miller*, 779 F.2d 1287, 1295 (7th Cir.1985), *cert. denied*, 476 U.S. 1142 (1986)). A number of district courts have since applied the "some indicia of reliability" standard to decisions regarding placement in Ad Seg. *See Tapia v. Alameida*, 2006 WL 842470, at *9 (E.D. Cal. Mar. 29, 2006); *Jones v. Gomez*, 1993 WL 341282, at *3 (N.D. Cal. Aug. 23, 1993); *Madrid*, 889 F. Supp. at 1273. This Court agrees that the evidence relied upon to confine an inmate to the SHU for gang affiliation must have "some indicia of reliability" to satisfy due process requirements.

### A. Some reliable evidence

The Court finds that plaintiff has raised serious questions as to the reliability of the four pieces of evidence used to validate him. Plaintiff has submitted evidence disputing the interpretation of the drawing confiscated from his footlocker, as well as disputing that he created the drawing. Similarly, plaintiff has raised significant questions about the reliability of Officer Romero's April 13, 1993 typewritten report. At the very least, the parties' competing declarations from Officer Romero are sufficient to raise a dispute of material fact on this point.

---

[3] At least one of the three sources must be a direct link to a validated member, such as "a validated member or former member identifying the inmate/parolee as an associate; correspondence with a validated member; photographed with a validated member; staff or informant observations of being in company with a validated member; identified as an associate by a validated associate who has a documented direct link; etc." DOM § 55070.19.3; *Madrid*, 889 F. Supp. at 1242.

13

With regard to the 1992 and 1998 confidential informant reports, when using information from a confidential informant the record must contain "some factual information from which the committee can reasonably conclude that the information was reliable." *Zimmerlee v. Keeney*, 831 F.2d 183, 186 (9th Cir. 1987). In *Zimmerlee*, the Ninth Circuit held that

> a prison disciplinary committee's determination derived from a statement of an unidentified inmate informant satisfies due process when (1) the record contains some factual information from which the committee can reasonably conclude that the information was reliable, and (2) the record contains a prison official's affirmative statement that safety considerations prevent the disclosure of the informant's name. Review of both the reliability determination and the safety determination should be deferential.

*Id.* (citing *Mendoza v. Miller*, 779 F.2d 1287, 1293 (7th Cir. 1985)). The court went on to explain that reliability may be established in one of four ways:

> (1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information, (2) corroborating testimony, (3) a statement on the record by the chairman of the committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record, or (4) an in camera review of the documentation from which credibility was assessed.

*Id.* at 186-87. Furthermore, proof that the confidential informant previously supplied reliable information is sufficient. *Id.* at 187.

Defendants argue that the September 1992 confidential informant/debriefing report is reliable because (1) the informant incriminated himself by admitting criminal activity in providing the information, (2) some of the information had proved to be true at the time the report was prepared, and (3) part of the information had been previously supplied by an independent source. Plaintiff argues that the report is not reliable because the inmate debriefing process involves no risk of self incrimination. Furthermore, neither the information that "had proved to be true at the time the report was made," nor the independent proof, is identified on the report itself or elsewhere. Finally, plaintiff notes that the CDCR recognized the inherent unreliability of "laundry lists" which simply name alleged gang associates when CDCR changed its regulations in 2005. The Court finds that plaintiff has raised triable issues as to the reliability of this report.

Defendants argue that the 1998 confidential informant/debriefing report is reliable because the informant had previously provided information which proved to be true, other confidential informants

had independently provided the same information, and the informant incriminated himself in providing the information.

Plaintiff argues that the 1998 report is unreliable because it does not name the inmate allegedly assaulted by Lira, or provide the date or time frame of the assault. The Pelican Bay SHU cellblock activity logs that do refer to plaintiff fighting with a newly assigned cellmate are not corroborated by CDCR records. Moreover, plaintiff asserts that the dispute was because the cellmate had behavioral problems, and not for gang-related reasons. The disciplinary report that was generated regarding the incident reflects no evidence of physical violence or disciplinary violation cited against plaintiff. Furthermore, plaintiff argues that mailing a threatening letter is implausible because inmate mail at Pelican Bay was closely screened for gang-related communications at the time plaintiff allegedly sent the threatening letter. The Court finds that plaintiff has raised questions about the reliability of this report and the above mentioned pieces of evidence, and the Court finds that there are triable issues of material fact as to whether plaintiff's evidentiary due process rights were violated. Accordingly, the Court DENIES defendants' motion for summary judgement as to whether plaintiff's evidentiary due process rights were violated.

### B. Procedural due process

Defendants contend that plaintiff was afforded due process both at Deuel and at Pelican Bay because he (1) was provided with notice regarding the reasons for his placement in Ad Seg and the SHU, (2) had his status reviewed by numerous committees at DVI and Pelican, in which he was made aware of the reasons for the decisions being made and afforded an opportunity to express himself, (3) had his status reviewed by IGIs and the Special Services Unit, (4) submitted inmate appeals, (5) was afforded opportunities to review his central file and some of the evidence used to validate him, (6) was provided with confidential disclosure forms, and (7) had his housing placement regularly reviewed by different Classification Service Representatives.

Plaintiff argues his due process rights were violated because (1) he was never afforded an informal hearing before a CDCR IGI prior to the completion of his validation process, (2) all of his requests for access to the evidence relied on for his validation were rejected or ignored until October

15

18, 1996, almost a year after he was first placed in Ad Seg, and (3) his periodic reviews and appeals were not meaningful. The facts, accepted in the light most favorable to plaintiff, show that there is a dispute of material fact as to whether plaintiff's constitutional right was violated when he was not afforded an opportunity to be heard before he was validated as a gang associate and not afforded meaningful periodic reviews. Therefore, defendants' summary judgment motion as to the issue of procedural due process is DENIED.

## II.     Individual defendants

In their motion for summary judgement, defendants also argue that each individual defendant did not violate plaintiff's due process rights. However, plaintiff has raised questions of fact as to the reliability of the evidence used to validate him and the meaningfulness of the hearings. Because each remaining defendant was involved in some way, either in the evidentiary and validation process or in the subsequent hearings and appeals, the Court finds that plaintiff has raised triable issues of fact as to the liability of each defendant. Accordingly, the Court DENIES defendants' summary judgment as to the liability of each defendant.

## III.    Qualified immunity

Qualified immunity protects government officials from civil liability for actions taken within their official discretion insofar as these actions do not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is not merely a defense to liability; rather, when applicable, qualified immunity protects government officials from lawsuits and, hence, from the burdens of litigation. *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. *Id*. at 201. If, and only if, a violation can be made out, the next step is to ask whether the right was clearly established. *Id.*

By 1992, the law was clearly established that due process required that plaintiff be given notice and a meaningful opportunity to heard *before* he was validated as a gang associate; that "some evidence" support the decision and that the supporting evidence have some indicia of reliability; and that plaintiff be provided with periodic reviews that were more than meaningless gestures. *See Toussaint*, 926 F.2d at 802-03; *Cato*, 824 F.2d at 705; *Toussaint*, 801 F.2d at 1098-1101; *see also Guizar v. Woodford*, 2007 WL 951294, at *5 (N.D. Cal. Mar. 27, 2007) (denying qualified immunity in gang validation case because "defendants could not have reasonably believed that due process did not require their providing plaintiff with an opportunity to present his views to the officials responsible for placing him in administrative segregation and the SHU"); *Tapia*, 2006 WL 842470, at *16-17 (denying qualified immunity in gang validation case where plaintiff argued that he was not given notice and opportunity to be heard regarding initial validation and that post-validation hearings were not meaningful).

Defendants argue that they cannot be held liable for the possible procedural misstep of the IGI in initially validating plaintiff because reasonable officers in their position would not have believed they were violating the law in connection with their post-validation decisions. However, due process requires that plaintiff be provided with *meaningful* post-validation hearings. *See Tapia*, 2006 WL 842470, at *16-17. Plaintiff has set forth triable issues of fact as to the reliability of the validating evidence, as well as whether he was afforded a hearing before his validation as a gang associate and in the post-validation hearings while at DVI and Pelican Bay. Accordingly, the Court DENIES summary judgment as to the issue of qualified immunity.

**IV.     Damages claim for mental harm**

Defendants seek summary judgment on plaintiff's claim for mental harm, arguing that plaintiff has not substantiated either his diagnosis for PTSD nor any causal relationship between his diagnosed depression and PTSD and his SHU confinement. In support, defendants rely primarily on the opinion of their mental health expert, Dr. Adam Goldyne. However, plaintiff has submitted declarations of mental health experts who have concluded that plaintiff does suffer from PTSD, and that both plaintiff's depression and PTSD are a result of his eight year SHU confinement. As such, the Court finds that there are material issues of fact as to both diagnosis and causation.

Defendants also argue that the PLRA bars plaintiff's claim for emotional and mental distress damages. 42 U.S.C. § 1997e(e) provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

Interpreting this section as applied to a Fourteenth Amendment claim, the Ninth Circuit held, "§ 1997e(e) applies only to claims for mental and emotional injury. To the extent that appellant's claims for compensatory, nominal or punitive damages are premised on alleged Fourteenth Amendment violations, and not on emotional or mental distress suffered as a result of those violations, § 1997e(e) is inapplicable and those claims are not barred." *Oliver v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002). Accordingly, the Courts DENIES defendants' summary judgment motion as to this issue.

## V. Injunctive relief

Plaintiff seeks a judicial declaration that his gang validation was never supported by accurate or reliable evidence and implemented in violation of his procedural rights. In conjunction with this, plaintiff also seeks a court order directing defendant Tilton as Secretary of CDCR to expunge his validation as a Northern Structure associate from departmental records, to report the expungement to all gang-related law enforcement databases and clearinghouses to which the original validation was reported previously, and to remove all related documents from plaintiff's C-file.

Defendants argue that plaintiff's claim for injunctive relief is moot in light of plaintiff's forthcoming discharge from CDCR custody. Ordinarily, an inmate's "release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies unless the suit has been certified as a class action." *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995). However, plaintiff contends that his claim for injunctive relief is not moot because the validation will continue to have an adverse impact on him. *See Kerr v. Farrey*, 95 F.3d 472, 476 (7th Cir. 1996) (paroled prisoner's claim to have negative references expunged from prison record not moot "because any such references may have a continuing adverse impact on him"). Plaintiff argues that he will be at risk of suffering reprisal attacks from actual Northern Structure members or associates. Plaintiff notes

18

that defendants have gone to great lengths during the course of this litigation to show that prison gangs can assault former inmates on the outside if they are perceived – even wrongly – as dropouts or other enemies of the gang.

The Court agrees with plaintiff that his claim for injunctive relief is not moot. Defendants argue that plaintiff has failed to demonstrate how prison gang members, who are not provided access to CDCR's gang intelligence records, would have knowledge that plaintiff's gang files have been expunged. However, as the parties are aware, and as discussed at the summary judgment hearing, the trial in this matter, and any resulting judgment, will be a matter of public record. Thus, plaintiff's current status as a validated Northern Structure associate, and any expungement of that validation if plaintiff prevails, will be a matter of public record. Accordingly, the Court finds that plaintiff may continue to pursue his claim for injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motion for summary judgment. [Docket No. 249]

**IT IS SO ORDERED.**

Dated: March 4, 2008

SUSAN ILLSTON
United States District Judge