1  CHAPMAN, POPIK & WHITE LLP
   William B. Chapman, State Bar No. 88079
2  Mark A. White, State Bar No. 88332
   650 California Street, Suite 1900
3  San Francisco, CA  94108
   Telephone: (415) 352-3000
4  Facsimile: (415) 352-3030

5  Attorneys for Plaintiff
   Ernesto Lira

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12  ERNESTO LIRA,                    )   No. C-00-0905 SI (pr)
                                     )
13        Plaintiff,                 )   NARRATIVE STATEMENT OF DIRECT
                                     )   TESTIMONY FOR DANIEL B. VASQUEZ
14  v.                               )
                                     )
15  DIRECTOR OF CORRECTIONS, et al.  )   Trial Date:  January 12, 2009
                                     )   Ctrm:  10
16        Defendants.                )   Judge: The Honorable Susan Illston
                                     )
17  ─────────────────────────────────    Complaint Filed:  March 14, 2000

18

19        Plaintiff Ernesto Lira, pursuant to section 2(b) of the Court's standing Pretrial Instructions,

20  submits the attached Rule 26 expert report of Daniel B. Vasquez, dated November 20, 2007 as a

21  narrative statement of Mr. Vasquez's anticipated testimony on direct examination at trial.  Given the

22  time constraints established for the trial, counsel for Mr. Lira intend to adduce testimony from Mr.

23  Vasquez on direct examination that will cover certain of his opinions and the bases for them in

24  summary form, and accordingly believe that the Court should have the benefit of Mr. Vasquez's

25

26                                                                              118/1

1  | written statement of his opinions as set forth in this expert report, which is attached here as

2  | Exhibit 1.

3

4  | Dated:   January 19, 2009                        CHAPMAN, POPIK & WHITE LLP

5  |                                                   By:

6  |                                                        William B. Chapman

7  |                                                   Attorneys for Plaintiff Ernesto Lira

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  |                                                                                    118/2

# EXHIBIT 1

1  CHAPMAN, POPIK & WHITE, LLP
   William B. Chapman, State Bar No. 88079
2  Mark A. White, State Bar No. 88332
   650 California Street, Suite 1900
3  San Francisco, CA  94108
   Telephone: (415) 352-3000
4  Facsimile: (415) 352-3030

5  Attorneys for Plaintiff
   Ernesto Lira

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11

12  ERNESTO LIRA,                    )    No. C-00-0905 SI (pr)
                                     )
13        Plaintiff,                 )    EXPERT REPORT OF DANIEL B.
                                     )    VASQUEZ PURSUANT TO FRCP
14  v.                               )    RULE 26(a)(2)(B)
                                     )
15  DIRECTOR OF CORRECTIONS, et al.  )    Action Filed:  March 14, 2000
                                     )    Trial Date:  March 10, 2008
16        Defendants.                )
                                     )
17

18  I.    SUMMARY

19        I will offer expert testimony regarding the deliberate indifference of the defendant California

20  Department of Corrections ("CDC"), and its officers and employees to CDC's own rules and

21  regulations, and to the liberty interests of plaintiff Ernesto Lira as manifest in the decisions of the

22  CDC to validate Lira as an "Associate" of the Northern Structure prison gang and – as a CDC policy

23  consequence – in the placement of Lira in isolated Security Housing Unit ("SHU") for the remainder

24  of his prison term.[1]  I will further testify to the failure of the CDC to afford Lira adequate relief

25  _____

26        [1]    A small part of Lira's then-remaining 12 years of confinement was spent in
      Administrative Segregation  ("Ad-Seg") cells – which are SHU-like units in prisons that don't

                                          118/4              (continued...)

1  through available and approved CDC policies and procedures, and in addition to the failure of the

2  CDC to provide Lira with the court-approved procedures mandated by settlement of <u>In re Steve M.</u>

3  <u>Castillo</u>, case no. C94-2847-MJJ, in September 2004, which procedures were specifically designated

4  to be applied to further ensure the liberty interests of inmates, such as Lira, similarly classified on

5  similar unreliable evidence.

6      Further, I will testify that CDC owed a duty to treat Lira in a humane and safe manner, free

7  of the infliction of the loss of liberty and human society caused by years of confinement in a SHU

8  without adequate or reliable evidence of gang affiliation and without any investigation of Lira's

9  claim of improper "validation."

10  **II.    EXPERIENCE**

11      My opinions are based on 36 years of my professional experience in the field of corrections

12  and law enforcement.  My experience in corrections includes serving in the California Department

13  of Corrections ("CDC") for 30 years as a Correctional Officer, Correctional Program Supervisor I,

14  Parole Agent, Special Agent/Investigator, Classification & Parole Representative, Correctional

15  Counselor III, Program Administrator, Associate Warden, Deputy Warden, Chief Deputy Warden,

16  and Warden of San Quentin State Prison and Soledad State Prison.  In addition, I was a Member of

17  the California State Board of Corrections for eight years, and served for four years as Director of the

18  Santa Clara County Department of Corrections, reportedly the fourth largest county jail system in

19  California, with an average daily population of nearly 5,000 inmates.  I have also consulted in the

20  field of corrections and law enforcement since 1986, including consulting for the Corrections

21  Corporation of America ("CCA"), the largest of the private corrections corporations in the United

22  States.[2]  A copy of my Curriculum Vitae is attached to this report.

23

24      [1](...continued)
    have specific SHU units -- or (briefly) in county jails, or on parole.
25

26      [2]    I also served as Warden for CCA during a period when we brought into service
    the first and largest 2,300-bed, secure-celled facility in California currently under contract to the

                                                            (continued...)

118/5

No. C-00-0905 SI (pr) – Expert Report of Daniel B. Vasquez Pursuant to FRCP Rule 26(a)(2)(B)   2

1    Throughout my career, I have personally conducted dozens and dozens of criminal and gang-
2    related investigations and interviews of prison gang members and associates.  Additionally, I have
3    supervised and directed peace officers and investigative units in their investigations of criminal
4    activities, internal personnel investigations, and intelligence gathering efforts with respect to prison
5    gangs and, where appropriate, their street activities.
6    My expertise includes the personal debriefing of prison gang members and criminal gang
7    defendants; the classification and analysis of documents and other information developed by and
8    utilized by correctional and law enforcement agencies in their ongoing efforts to control and
9    prosecute the criminal activities of street and prison gangs; the direct investigation of gang cases; the
10   review of testimony and the investigative reports and documents of law enforcement agencies in
11   gang cases throughout California; courtroom testimony as an expert witness; attending
12   contemporary gang training seminars; as well as being an instructor and lecturer on many occasions
13   in the past several years on gang issues.
14   I have direct, hands-on knowledge and administrative experience in the development of
15   corrections policies and procedures, inclusive of operations from minimum to maximum custody,
16   and Security Housing Units (SHU), and county jail operations.  And, I have consulting experience
17   throughout the United States in many facets of contemporary corrections issues, including litigating
18   complex prison and jail cases involving civil rights; prison gang validation issues; conditions of
19   confinement issues; death in custody/injury issues; street gang enhancement charges; as well as in
20   the application of codified rules, regulations, and policies governing prison and county jail
21   operations.

22   **III.    DEPOSITION TESTIMONY AND DOCUMENTS REVIEWED**

23   In forming my opinion, I relied on the discovery propounded and responded to in this case,
24   including interrogatories, requests for admission, and documents produced, including:  (1) Ernesto
25
26   [2](...continued)
     Federal Bureau of Prisons.                                          118/6

1   Lira's C-file as produced, nos. EL 0001-0721; defendant's document production nos. AGO 0001-

2   0162; and the depositions of: Edward Alameida, Jr., Dirk Covello, Diana Crandall, Paul Dillard,

3   Ernesto Lira, Brian Fielder, Robert Gordon, Joe McGrath, Judy Olson, Mark Piland, Terry

4   Rosenkrans, and Milo Smith. And I relied on relevant documents concerning CDC policy and

5   procedures including: CCR Title 15 (Crime Prevention and Corrections Rules and Regulations of

6   Adult Institutions, Programs and Parole), updated through September 7, 2007; CDC Departmental

7   Operations Manual (Revised) No.55070; and the Settlement Agreement in <u>Steve M. Castillo v.</u>

8   <u>Edward S. Alameida, Jr.,</u> United States District Court, Northern District of California, No. C94-2847

9   MJJ-JCS.

10   **IV.   OUTLINE OF OPINIONS**

11         A.   The CDC's Original 1993 Validation of Lira as an Associate of the Northern

12              Structure Prison Gang Was Flawed.

13              1.   The Evidence Relied on Was Insufficient and Unreliable.

14                   a.   The Drawing [See EL 0079].

15                        i.   Even the CDC's witnesses are unable to consistently identify

16                             gang symbols in the drawing.

17                             (a).   There is no "North Star" to be found.

18                             (b).   The number "14" is ambiguous at best.[3]

19                             (c).   The "Huelga Bird" is not a gang symbol.[4]

20

---

21         [3]   The common marking/tattoo of the "14" represents the 14th letter of the alphabet
22   and stands for the letter "N" or "Norte," Spanish for the North. The symbol "14" is not and does
     not denote solely or exclusively the "Nuestra Familia" or the "Northern-Structure" prison gangs;
23   it denotes the Norteño-Hispanic in general, and represents a geographical identification with
     Mexican-American residents of Northern California. The "14" symbol is commonly found as
24   graffiti in playgrounds and elsewhere in the community as well.

25         [4]   The so-called "Huelga Bird" became a symbol of Hispanic/Mexican-American
     Unity during the United Farm Workers Labor Movement of Ceasar Chavez. The Eagle is a
26   symbol found on the National Flag of the Nation of Mexico and its Aztec-based history has
     nothing to do with the prison gangs the "Nuestra Familia" or the "Northern Structure."

118/7

  ii.  The Identification of Lira as the Artist Is Unsupported.

    (a).  C.O. Gordon's chrono statement was not his own.

    (b).  Lira's name is not on the drawing (except as written in by CDC).

    (c).  The "original" is a photocopy.

    (d).  No other similar drawings by Lira exist.

 b.  The Merced County Jail Yard Incident Report [See EL 0071].

  i.  The report contains no reference to voluntary prison gang activity or association.

    (a).  In 1992, all "Norteños" at the County jail were apparently housed together, whether associated with prison gangs or not.

    (b).  The report does not identify Lira as a prison gang associate.[5]

    (c).  The "Sureño/Norteño" mixing in the yard was caused by an electrical fire.

    (d).  The report does not describe any incident of physical contact, or any threat involving Lira.[6]

---

[5]  The report of Merced County Officer R. Romero clearly identifies Lira only as associated with a street gang: "Lira, Ernesto George aka: Chino, DOB 010664 CDC #60198, Norteno, M14 associate." This identification is marked clearly with a demarcation/(forward slash mark), and is followed with information on Morales as: "Northern Structure member and NF associate, Morales, Juan aka: Pulga, DOB 021866 CDC# D02845." The label "Northern Structure" was apparently mis-read/interpreted as belonging to the part of the report pertaining to inmate Lira.

[6]  The only report was that Lira made some remark to Officer R. Romero ... "we only wanted to play with them Romero...". There was no physical confrontation.

118/8

ii.    The typed report relied on for validation was prepared 12
       months after the events occurred.

iii.   The author of the report sent a later clarification of Lira's
       status, which was ignored.

    (a).    According to Romero, the Merced county jail had no
                evidence that Lira had any prison gang affiliation.[7]

c.   The "Laundry List" Identification [See 1992 "de-briefing" report,
     AGO-0068-80].

i.   The use of a completely uncorroborated "listing" in a
     debriefing report is not an acceptable piece of reliable evidence
     that can be used to validate an inmate as a prison gang affiliate.

    (a).    The CDC's acceptance of such "laundry list"
                identifications, without corroboration, conflicted with
                the applicable "Director's Rules" codified in CCR,
                Title 15 and with CDC practice.[8]

---

[7]      Merced County Officer R. Romero on 3/8/1998 wrote to CDC a "To Whom It May Concern" letter, which clarified his memo of 1992: "We cannot find any gang validation on Ernesto Lira in Merced County Jail ... Lira is always housed in general population with other Northern Hispanic inmates which is the majority of our jail ... I hope this will clarify any misunderstanding that you may have," ... Margin note ... "Authenticity verified by Sergeant J. Cello through contact with Merced County Jail Officer R. Romero". The Classification files of all county jails include inmate prison/street gang information that has been relied upon for years by CDC IGI staff.

[8]      During the time-line period when Lira was validated as an "Associate" of the prison gang "Northern Structure", the undersigned was the Warden of San Quentin State Prison and I had on-going experience with prison gangs and members/associates and was familiar with all the then and present CCR Title 15 Director's Rules and Regulations; which always made clear the responsibility and the requirement for identifying three (3) independent sources of information which were required to independently pass the test of reliability. Contrary to the deposition testimony of former correctional Lieutenant Dirk Covello, the undersigned was not aware of any policy decision that would have allowed the use of a "Laundry List" of inmate names (in a report considered "Confidential") to be used to validate the inmates named therein as
(continued...)

---

  (b). The CDC admitted the unreliability of such "laundry lists" in the <u>Castillo</u> case.

 2. CDC Failed to Provide Lira with Notice.

  a. Lira was validated, without any notice at all, while he was on parole.[9]

  b. Two years later, when notice was provided, CDC ignored Lira's denials and the evidence he offered.[10]

 3. Despite Admitting a Responsibility to Investigate Potentially Exculpatory Claims, CDC Never Did Any Meaningful Investigation of the Drawing, the Jailyard Report, or the 1992 Laundry List.

 4. Other Procedural Irregularities.

  a. Unsigned materials were relied on.

  b. Late reports were relied on.

B. The CDC's Continuing Failures with Respect to Lira's Validation.

 1. The Failure to Respond to Lira's Appeal.

  a. In late 1995, Lira was placed in Ad-Seg at DVI, pending validation.

   I. For the next 10 months, Lira was never provided an opportunity to be heard.

---

[8] (...continued)
a gang member and/or associate, when the individual listing had not been corroborated and passed the test of reliability. Instead, the names of the inmates listed, in the above-mentioned report would be routinely forwarded to the appropriate institution's IGIs for further investigation.

 [9] There is no evidence that a CDC-1030 was prepared or that any notice was given to alert Parole & Community Services Division that Lira, then on active parole, had been validated as an associate of the "Northern Structure" prison gang. Indeed, if that had been done, Lira would have been placed on High Control Parole Supervision under a Parole Agent Gang Specialist.

 [10] At a minimum, prior to the Classification hearing that was conducted on Lira which resulted in his confirmation as an associate of the "NS", a CDC-1030 should have been completed and recorded to either put the prior validation of Lira in issue or change that status. 118/10

ii.    Repeated 5-minute ICC appearances were meaningless exercises.

iii.    Lira's signature on 114 forms did not waive his procedural rights.

b.    Lira's July 1996 602 appeal.

    I.    The appeal was never meaningfully investigated or considered.

    ii.    Lira was shown chronos for the drawing and the yard-incident report, but was not shown the evidence itself.

2.    1996 "Re-Validation"

a.    Process involved nothing more than determining that the same three items of evidence that were used in 1993 were documented in Lira's C-File.

b.    There was no new consideration, investigation, or re-evaluation.

3.    The "New" 1998 Validation

a.    The 2000 inactive gang task force review – absence of any evidence of ongoing gang activity from data bases and clearinghouse sources should have made Fielder suspicious of 4/1/98 debriefing report.

b.    4/1/98 report was implausible and unreliable.

    I.    Lira should have been provided a form 1030 disclosure when the informant report was generated mid-1998, not two years later in mid-2000.

    ii.    Report of cellmate assault at direction of non-validated gang member makes no sense and is implausible on its face.

    iii.    Cellmate assault even more implausible as a situation involving actual physical fight in light of the CDC's cell block

118/11

---

log entries, coupled with the lack of any 115 disciplinary proceeding or documentation (also lack of infirmary records).

    iv.    Report of "teaching bonds" and "disciplinary writing" also called into question by unreliability of cellmate assault report.

    v.    Report of threatening letter to informant's mother also implausible; letter would have been opened and read at PBSP.[11]

    vi.    Reliability of information on Lira in 4/1/98 report also made questionable by sequence of Sgt. Romero letter 3/8/98, and perceived need in its immediate aftermath to develop other/additional gang evidence on Lira (see Piland fax transmittal); improper institutional bias/predisposition to retain Lira as validated, especially with pending 602 appeal.

    4.    Failure to Declare Lira "Inactive"

    a.    Per Title 15 regulations, Lira should have been considered for inactive status in early 2004, six years after incidents in 4/98 report.

    b.    Inactive status review not conducted until 2007, and even now, no official re-classification despite determination and recommendation of inactive status for Lira.

## V. CONCLUSION

The impact of validation on an inmate's life in prison cannot be overstated. Once he is validated as an associate of a prison gang, an inmate is thereafter confined to a special housing unit with almost no opportunity for human contact, except to receive orders from watching guards.

---

[11]    The CDC will "flag" all out-going and in-coming SHU housing correspondence from/to validated gang members/associates and it will be inspected by IGI for codes related to any gang business, or potential threats; especially a letter that was marked "return to sender".

118/12

1   There are essentially only three ways out of the SHU: die, "debrief," or be released from prison."[12]

2   Moreover, the impacts of validation on a former inmate's life is enormous. Because of the CDC-R

3   validation, Lira has experienced gang peer pressure to carry out activities in furtherance of the

4   gang's objectives. His continued denial of any gang affiliation and his refusal to act out in support

5   of the gang has apparently resulted in Lira's having been put on the gang's "No Good List" – and

6   this makes him potentially subject to "street" retribution by physical attack or even murder. The

7   pressure on an ex-offender to reintegrate back into his community – and into his family – and the

8   prospects of securing gainful employment are difficult enough. But these pressures have now

9   increased on Lira exponentially because he still carries the stigma of being/belonging to a prison

10  gang that is considered by the community, by potential employers and by law enforcement to be a

11  threat to the safety and security of the community.[13]

12      Because even prisoners who (like Lira) have no history of violence are subjected to

13  validation and indefinite SHU confinement, CDC must administer this process according to the

14  requirements of the Constitution and its own rules and regulations.

15      In my opinion, CDC did not do that in the case of Ernesto Lira.

16  Dated: November 20, 2007

17

18                                      Daniel B. Vasquez

19

---

20      [12]    Also, CDC policy requires declaring a validated prisoner inactive after six or
21  more years without reliable proof of additional gang activity. There is little evidence that this
    "policy" is fairly implemented. For Lira, at least, it seems that this policy was ignored.

22      [13]    As former Correctional Captain and Pelican Bay Associate Warden Dillard
23  describes in his interpretation of Department Policy with respect to "procedural violations" in his
    deposition: "All I can tell you is that [in] all my years with the Department, 34 years, I'm not a
24  neanderthal. I do believe in fair process. Just because a guy got convicted of a crime doesn't
    mean he doesn't have rights. If I see something I thought was questionable in nature, whether he
25  got a fair shake, I would take the steps to do what was expected of me, [that's] the proper method
    . . . I'd send [it] back." From my own 30 years of experience in CDC, that is what all the little
26  words and phrases in the regulations have always required – fairness. The truth has to prevail;
    even if it means we were wrong, we correct the error."                          118/13

1   VERIFICATION OF NARRATIVE STATEMENT OF DIRECT TESTIMONY

2      I, Daniel B. Vasquez, state:

3      1.      The statements made in my initial Rule 26 report of November 20, 2007 are true

4   and correct statements of my background, the documents I have reviewed, and the opinions I

5   have formulated in this case.  If called as a witness in this trial, I could and would, of my own

6   personal knowledge, competently testify to all of these statements as a part of my direct

7   testimony.

8      I declare under penalty of perjury under the laws of the State of California that the

9   foregoing is true and correct.

10     Executed this 19th day of January 2009 at San Francisco, California.

11

12                                                    Daniel B. Vasquez

13

14

15

16

17

18

19

20

21

22

23

24

25

26