UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERNESTO LIRA,

        Plaintiff,

    v.

MATTHEW CATE, SECRETARY OF
CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION,

        Defendant.

_____/

No. C 00-0905 SI

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER**

      Plaintiff Ernesto Lira filed this civil rights action under 42 U.S.C. § 1983, challenging his placement in administrative segregation ("Ad-Seg") while at Deuel Vocational Institution, and later in a Security Housing Unit ("SHU") at Pelican Bay State Prison. Prison officials placed plaintiff in Ad-Seg and the SHU after he was "validated" as an associate of the Northern Structure prison gang. Plaintiff claims that his due process rights were violated because he was not in fact an associate of the prison gang and his validation was not supported by sufficient, reliable evidence. Plaintiff also claims that his due process rights were violated because he was not given notice and an opportunity to present his views before being placed in segregation, and because he was denied meaningful opportunities to challenge his validation and continued retention in segregated housing.

      Plaintiff originally filed this case *pro se*. By order filed May 17, 2002, the Court dismissed the case without prejudice on the ground that plaintiff had not exhausted his administrative remedies with respect to all of the claims alleged in the complaint. Plaintiff appealed to the Ninth Circuit, and the Ninth Circuit appointed counsel to represent plaintiff on appeal. The Ninth Circuit reversed and remanded, holding that the Prison Litigation Reform Act did not require dismissal of an entire action where a prisoner's complaint contains exhausted and unexhausted claims. *See Lira v. Herrera*, 427 F.3d

1164 (9th Cir. 2005). Instead, the Ninth Circuit instructed that the proper treatment of a "mixed" complaint depends on the relatedness of the claims. If the exhausted and unexhausted claims are interrelated, the district court should dismiss the complaint and allow the plaintiff the opportunity to amend the complaint to excise the unexhausted claims; if the claims are not interrelated, the court should dismiss the unexhausted claims and allow the case to proceed.

With respect to Lira's case, the Ninth Circuit stated:

> The district court's dismissal of Lira's case turned on its implicit, but not fully discussed, interpretation of Lira's complaint as presenting *multiple* claims regarding his validation as a Northern Structure gang member. It correlated the number of grievances filed within the California prison system with the number of claims within his complaint, and therefore did not regard his complaint as presenting a single due process claim challenging the unavailability of the evidence used against him and resulting in his placement and retention in administrative segregation.

> Lira has argued to this court, having received counsel since his last appearance in district court, that his complaint actually presents "a constellation of due process violations for his validation as a gang associate and his placement and retention in the administrative segregation at [DVI] and the SHU at Pelican Bay" that amounted to a *single*, exhausted claim.

*Id.* at 1177 (emphasis in original). The Ninth Circuit noted that "[a]lthough there is force to Lira's argument, we leave it to the district court to consider this new characterization of Lira's due process claim in the first instance." *Id.* at n.13.

On remand, plaintiff continued to be represented by counsel. The Court found that plaintiff's due process claims were interrelated, and allowed plaintiff to file an amended complaint alleging a single due process violation arising out of his gang validation and placement and retention in Ad-Seg and the SHU. As originally filed, plaintiff's first amended complaint named as defendants a number of CDCR personnel sued for damages in their individual capacity, along with the Secretary of CDCR, who was sued in his official capacity for declaratory and system-wide injunctive relief. As a result of procedural and factual developments, plaintiff dismissed the individual defendants and all claims for damages, leaving only claims for declaratory and injunctive relief specific to plaintiff. From January 13 to February 12, 2009, the Court held a bench trial on plaintiff's claims for declaratory and injunctive relief.

As set forth below in the Findings of Fact and Conclusions of Law, the Court finds that plaintiff's due process rights were violated when he was initially validated as a Northern Structure

1   associate because he was never given notice of the initial validation investigation, and was never

2   afforded the opportunity to be heard prior being validated or placed in administrative segregation;

3   indeed, plaintiff was completely unaware of the entire initial validation process and was on parole at the

4   time of the validation.  The Court also finds that this deprivation of procedural due process was not

5   cured in any of the subsequent administrative hearings and inmate appeals because none of these

6   proceedings constituted a meaningful review of the gang validation.  Finally, the Court finds that

7   plaintiff's substantive due process rights were violated because the items of evidence used to validate

8   plaintiff as a prison gang associate lack sufficient indicia of reliability to meet the "some evidence"

9   standard as required by the case law.  *See Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S.

10  445, 455 (1985); *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987).

11       As a result of the improper validation, plaintiff spent over eight years in the SHU at Pelican Bay

12  State Prison.  During that time, plaintiff suffered from the extreme confinement, isolation and

13  deprivation of SHU imprisonment, witnessed violence among inmates, including the strangulation of

14  an inmate, and feared that he would be the target of reprisal due to his refusal to affiliate with the

15  Northern Structure prison gang.  Based upon expert testimony and evidence at trial, the Court finds that

16  plaintiff's experience in the SHU caused him to develop clinical depression and post-traumatic stress

17  disorder, and that plaintiff suffers from these conditions today, despite his parole from Pelican Bay.

18       The Court finds that plaintiff is entitled to a judicial declaration that his gang validation was

19  never supported by accurate or reliable evidence and was implemented in violation of his procedural

20  rights.  The Court also finds that plaintiff is entitled to an order directing defendant Matthew Cate as

21  Secretary of CDCR to expunge plaintiff's validation as a Northern Structure associate from CDCR

22  records, to report the expungement to all gang-related law enforcement databases and clearinghouses

23  to which the original validation was reported previously, and to remove all documents related to the

24  validation from plaintiff's prison file.

25

26                                  **FINDINGS OF FACT**

27  **A.      Plaintiff's Background**

28       1.       Plaintiff is a forty-five-year-old Mexican-American man who was born in Van Horn,

3

**United States District Court**
For the Northern District of California

1    Texas.  Plaintiff is the second youngest of nine children, and he grew up in a small town called Planada,

2    California, where his parents were farm workers.

3         2.    Plaintiff attended school through the tenth grade, and then in 1980 was sent to the

4    California Youth Authority ("CYA") for possession of stolen goods.  Between 1982 and 1996, plaintiff

5    had several felony convictions for small theft-related crimes, and one crime involving possession of

6    methamphetamine.  None of these crimes involved violence or were gang-related.

7         3.    In 1992, plaintiff was charged with petty theft and awaited trial at the Merced County

8    jail. Plaintiff was convicted, and on June 18, 1992, he was sent to Deuel Vocational Institution ("DVI")

9    for processing.  After he was processed, plaintiff was transferred to the Sierra Conservation Center

10   ("SCC") at Jamestown, California, to serve his sentence.

11        4.    At SCC, plaintiff was housed with the general inmate population.[1]  Plaintiff earned work-

12   time credit by working as a dorm janitor, and at one point was a janitor for a dormitory that included

13   Mexicans from Southern California.  This caused no problems for plaintiff.  Plaintiff slept in an 18-bed

14   dormitory building, which included a day-room with a television, and he ate and engaged in sports and

15   other recreational activities with fellow inmates.  Plaintiff also had unrestricted access to a communal

16   yard, a library, and educational programs.  Plaintiff's mother and sister often visited plaintiff while he

17   was at SCC.  Plaintiff remained incarcerated at SCC from August 13, 1992 until he paroled on May 14,

18   1993.

19

20   **B.    The Northern Structure Prison Gang**

21        5.    Prison gangs have been a consistent problem for California prisons.  The United States

22   Supreme Court has described prison gangs as organizations that are "[c]landestine, organized, fueled

23   by race-based hostility, and committed to fear and violence as a means of disciplining their own

24   —————————————————

25        [1] Plaintiff was housed in the lowest security portion of the facility, Level I, until around April
     7, 1993, when SCC prison officials received information that plaintiff was trying to escalate problems
26   between Northern and Southern Hispanic inmates on the prison yard.  As a result of this information,
     plaintiff was placed in Ad-Seg.  On April 22, 1993, plaintiff appeared before the Institutional
27   Classification Committee concerning this incident, and he informed the ICC that he would not cause or
     experience any further problems if released from Ad-Seg.  ICC released plaintiff to the medium security
28   portion of the facility, Level II, where he stayed until he paroled on May 14, 1993.  This incident was
     not the basis of plaintiff's subsequent prison gang validation.

4

members and their rivals, [and which] seek nothing less than to control prison life and to extend their powers outside prison walls." *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005). Faced with serious threats to institutional safety at the hands of gang members, the California Department of Corrections and Rehabilitation ("CDCR") instituted a policy of administratively segregating any inmate who is "validated" as a member of a prison gang. This validation process is initiated when prison officials suspect an inmate of gang affiliation, and involves an investigation into an inmate's possible gang connections. If the investigation yields sufficient evidence of an inmate's connection to a prison gang, the inmate is formally validated and is segregated from the general prison population.

6. The "Northern Structure" ("NS") prison gang is made up of Hispanics from Northern California ("Northern Hispanic" or "Norteño"). NS was created in 1984 as a subsidiary of the "Nuestra Familia" ("NF") prison gang. NF is a formerly prominent prison gang that lost influence within the prison system after CDCR began recognizing and validating its members. Because NF members were increasingly segregated, NF created a subsidiary prison gang called the Nuestra Raza, which CDCR recognizes as the Northern Structure. NS recruits for, and is subordinate to, NF. Symbols commonly associated with the Northern Structure gang are the Northern Star, the Huelga bird, and the number "14."

## C. The 1993 Prison Gang Validation of Plaintiff

7. In approximately December of 1992, while plaintiff was still at SCC, prison officials at SCC initiated the process of validating plaintiff as an associate of the Northern Structure prison gang. Assistant Institutional Gang Investigator ("IGI") Milo Smith, who had training and experience in prison gang investigation, handled plaintiff's gang validation. Officer Smith testified that he does not recall why he initially began investigating plaintiff.[2]

---

[2] The record is unclear as to exactly when or why the validation process began. IGI Smith testified that he does not recall the impetus for initiating the validation process for plaintiff or when the validation began. However, it appears that the impetus was likely a September 1992 debriefing report which identified plaintiff as a Northern Structure member. This report was placed in plaintiff's central file ("C-file"), and likely came to the attention of Officer Smith, as the evidence shows that Smith started investigating plaintiff as early as December 1992; Officer Gordon, a correctional officer at SCC, testified that Officer Smith called him in December 1992 and asked him to search plaintiff's locker because Officer Smith was investigating plaintiff for gang affiliation. Thus, the Court infers that the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

8.    CDCR regulations specified the permissible forms of validating evidence and required that any validation be supported by at least three evidence items, each independent in source and subject, and with any "confidential" item used having some indicia of reliability.  15 Cal. Code of Regs. § 3378(c) (validation process); 3321 (use of confidential material).

9.    Plaintiff was not aware that this validation process had been initiated.  No one informed plaintiff that he was being investigated or met with him during this process.

10.    Officer Smith's investigation yielded four pieces of evidence that he believed were sufficient to validate plaintiff as a Northern Structure member, which are as follows:

### a.    The September 25, 1992 Confidential Inmate Debriefing Report

In 1992, a validated Northern Structure associate underwent the debriefing process with DVI prison administrators.[3]  Officer Reyes Hernandez prepared the debriefing report, which consisted largely of a long narrative of the debriefing informant's history with the Northern Structure, and concluded with a list of names that the informant identified as NS members, also called a "laundry list."[4]  (Ex. 4).  Plaintiff is not identified in the narrative text of the report, although a different inmate by the name of Lira (with a different prison identification number) is mentioned in the text of the report; the Lira mentioned in the narrative portion of the report is not named in the laundry list. (Ex. 4).  Plaintiff's name appears on the laundry list at the end, where he was identified as a Category III NS member.[5]  *Id.*

---

validation process began around December of 1992.

[3]  Debriefing is when a validated inmate formally disassociates with his prison gang by meeting with prison officials, renouncing his membership in the gang, and identifying other gang members and associates.  Other than being placed on inactive status or expiration of sentence, debriefing is the only way an inmate can be removed from segregation based on gang affiliation.

[4]  As Officer Piland explained, a "laundry list" refers to the list at the end of a debriefing report in which a debriefing inmate simply names inmates that are associated with the gang and provides their rank.  The debriefing officer asks the inmate for this list at the end of the debrief.  The list is meant to verify the names that the inmate has stated in his narrative report and clearly identifies each inmate so that prison officials can easily place the reports in each inmate's C-file without reading the entire narrative portion.

[5]  Category III is a position of leadership within the Northern Structure.  According to defendant's prison gang expert, Robert Marquez, a Category III member is the equivalent of a "commanding officer" in the Army.  Marquez described Category III members as "holding leadership positions," being "responsible for overseeing given areas," and communicating directly with Nuestra

6

Officer Hernandez was satisfied that the debriefing inmate was telling the truth. The report was considered reliable by CDCR standards because the informant incriminated himself, the veracity of other information provided by the informant was confirmed through independent investigation, and part of the information provided had also been supplied by independent sources. The debriefing report was placed in the C-file of every inmate identified therein. Plaintiff was completely unaware of this debriefing report, and did not know that it had been placed in his C-file.

**b.      The Drawing**

In December of 1992, Officer Smith asked Officer Gordon to search plaintiff's locker at SCC for any gang-related material. When searching plaintiff's locker, Officer Gordon found a drawing that he thought might contain gang symbols, and he brought it to Officer Smith. Officer Smith reviewed the drawing and determined that it contained three Northern Structure symbols: the number "14," the "Northern Star," and a Huelga bird. Defendant also contends that plaintiff's nickname, "Chino," appears in the drawing. Plaintiff knew that the drawing had been confiscated. He did not deny that it was his, and in fact asked for it back from Officer Gordon. Plaintiff did not know, however, that the drawing was being used to validate him as a gang member.

**c.      The April 24, 1992 Merced County Jail Incident Report**

In the course of his investigation, Officer Smith contacted Officer Romero at the Merced County Jail, where plaintiff had been housed at various times in the 1980s and 1990s. Officer Smith asked Officer Romero whether the Merced County Jail had any record of plaintiff's involvement in a gang. Officer Romero responded that there had been an incident involving plaintiff on April 24, 1992, and that he would forward Smith a copy of the report. Romero consulted the handwritten report that he had prepared the day of the incident and determined that it was "not presentable" to send to CDC, so he prepared a longer typed report and sent the typed version to Smith. (Ex. 1, 6). Romero prepared the typed report on April 13, 1993.

Familia members. (1783:21-1784:5).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Both reports concern an incident at the Merced County Jail yard in which Northern Hispanic and

2    Southern Hispanic inmates were inadvertently released into the yard at the same time. The Northern

3    Hispanic inmates began questioning the Southern Hispanic inmates, and Romero sensed that a fight

4    might break out. Romero called in other officers, and the incident was broken up before any violence

5    ensued. The original handwritten report contained only a very short account of this incident, and listed

6    inmates Juan Morales, a validated Northern Structure gang member, and Daniel Hernandez as being the

7    main instigators. Plaintiff was not mentioned in the narrative text of the handwritten report, but was

8    listed as one of the inmates involved.[6]  (Ex. 1).

9    The typed report that Smith received and eventually used as evidence in plaintiff's prison gang

10   validation contained a more detailed and somewhat different account of the incident. The typed report

11   states that plaintiff and Juan Morales confronted and questioned two Southern Hispanic gang members.

12   The report states that as officers broke up the group, plaintiff commented to Romero "[c]ome on

13   Romero. All we wanted to do was play with them a little while. You know when we go to the 'pen'

14   they (meaning Sureños) rush us from the gate."  (Ex. 6).  Smith interpreted this statement as an

15   admission by plaintiff of his gang affiliation.

16   The typed report includes a block of type listing the six Norteño inmates involved, including

17   their imputed gang affiliations. Romero used a slash mark as punctuation to separate each listed inmate

18   from the next:

19           AS 3 BLOCK CAME INTO THE YARD THE FOLLOWING GANG
         MEMBERS GROUPED TOGETHER AND STARTED TO SCAN THE YARD. THE
20       INMATES WERE, LIRA, ERNESTO, GEORGE, AKA "CHINO" DOB 010664 CDC
         #C60918, NORTENO, M 14 ASSOCIATE/NORTHERN STRUCTURE MEMBER
21       AND NF ASSOCIATE, MORALES, JUAN AKA "PULGA" DOB 021866 CDC #
         D02845 . . . .
22

23   (Ex. 6) (emphasis added). Thus, the reference to "Northern Structure Member" applied to inmate Juan

24   Morales, not plaintiff. At trial, Romero testified that "there should have been more of a space or a gap

25   where Lira and Morales' name[s] kind of run together" (416:3-4). When Smith received the typed

26   report, he did not realize that the words "Northern Structure Member" were describing the next inmate

27   _____

28       [6]  Plaintiff was identified in the handwritten report as a "Norte 14, VPX Planada." Officer
     Romero testified that "Norte 14" is slang for a Northern Hispanic street gang member. Officer Romero
     also testified that he had no reason to believe that plaintiff was a prison gang member or associate.

8

United States District Court

For the Northern District of California

listed, Juan Morales, and not plaintiff.  On May 10, 1993, Officer Smith prepared a "128-B chrono" for Romero's April 13, 1993 typed report: the 128-B chrono mistakenly stated that plaintiff was identified as being an associate of the Northern Structure prison gang:

> On April 13, 1993, I received information from Officer Romero of the Merced County Sheriff's Department, who identifies inmate Lira H-36693 AKA "Chino" "to be an associate of the NORTHERN STRUCTURE Prison Gang, and a member of the Norte 14.

(Ex. 10).  Officer Romero's April 13, 1993 report, and Smith's accompanying 128-B chrono, were placed in plaintiff's C-file.

### d.      1993 confidential memorandum by Officer Gordon

Officer Gordon prepared a confidential memorandum.  This memorandum was later rejected by the Special Services Unit ("SSU"), which reviews validation packages, because it did not meet departmental criteria for gang validation, and therefore, there was very little description of this memorandum at trial.

## D.      1993 Initial Validation Process

11.      Having compiled the foregoing "source items," Officer Smith put together plaintiff's formal validation package.  The package consisted of the September 1992 confidential inmate debriefing report, the drawing, Romero's typed Merced County Jail incident report, and the 1993 confidential memorandum authored by Officer Gordon.  Each piece of evidence was accompanied by an individual chrono.  (Ex. 11).

12.      Once Officer Smith put together plaintiff's formal validation package, he gave it to his superior, Institutional Gang Investigator Dirk Covello, for approval.  At trial, IGI Covello did not explain what standard applied to his review of the package that Smith put together: "The criteria that I used is the report authored by Milo Smith [Ex. 8 and 9], the report authored by Romero [Ex. 6], the report authored by Officer Gordon [Ex. 273, not relied on by SSU and deemed "unreliable"] . . . [and] the confidential [report] on a debriefing [Ex. 4]."  (153:22-154:24).

13.      On or about May 11, 1993, IGI Covello approved the validation package and

memorialized that approval in a 128-B chrono that same day. (Ex. 11). IGI Covello testified that he did not recall making any independent investigation of any of the pieces of evidence in the validation package; he did not personally investigate whether plaintiff made the drawing, nor did he ask Smith to do so; and he was not aware that there was an earlier, handwritten version of Romero's Merced County Jail report. IGI Covello also testified that he agreed that it was important to confront an inmate under investigation for gang validation with the fact of the investigation and with the validation evidence.

14.     On May 18, 1993, IGI Covello prepared a cover letter and a gang-validation worksheet, and then transmitted the validation package to SSU in Sacramento, California for review. SSU performs a "quality control" and checks to see if the source items comply with CDCR requirements, but does not investigate the truth or falsity of the items. The IGI is charged with that responsibility.

15.     On June 22, 1993, SSU received plaintiff's validation package and SSU analyst Judy Olson reviewed the package for compliance with departmental regulations. Olson testified at trial that she has no memory of plaintiff's validation specifically. However, she testified that it was not her job to make an independent investigation into the meaning or reliability of the evidence she received in the validation package. Olson testified that she "took the documents [she] received in the validation package . . . at face value." 70:1-6. Rather, she just made sure that the evidence conformed to CDRC departmental regulations. Olson concluded that three of the items of evidence met departmental criteria for gang validation, but that the 1993 confidential memorandum authored by Officer Gordon did not. On July 2, 1993, Olson authored a 128-B chrono officially validating plaintiff as an associate of the Northern Structure prison gang. At that time, plaintiff was on parole.

16.     Defense witness CDC Special Agent Michael Ruff, who has extensive training and experience in the validation process, testified that the validation process generally works as follows: once the gang investigator has prepared the validation package, someone in the institution would prepare a "114-D lockup order" to remove the inmate from the general population. The inmate would receive the lockup order, as well as a copy of all non-confidential documents in support of the validation, as well as a 1030 confidential disclosure form that informs the inmate of the confidential material used for validation. "The 1030 should provide him with enough information that he knows what the source is, but doesn't reveal the source of the person providing the information, so as to protect the – the

informant." 1353:22-25.  Once the information is provided to the inmate, the validation package is sent to Sacramento for review.  Ruff testified that even if an inmate is on parole, he should be given copies of all non-confidential documents used as validation evidence, as well as the 1030 disclosure form.  Ruff also testified that if an inmate is on parole, the 128-B chrono should go to the parole officer.[7]

17.     None of these normal procedures were followed in plaintiff's validation.  Throughout the entire investigation and validation process, plaintiff was totally unaware that he was being investigated as a gang member.  Contrary to the normal procedures, plaintiff was not given copies of the documents used to validate him, nor was he provided with the general 128-B validation chrono (or the 1030 disclosure form).  On May 11, 1993, the date IGI Covello prepared the 128-B chrono documenting plaintiff's validation, plaintiff was still at SSC (he paroled three days later on May 14, 1993).  When plaintiff was officially validated on July 2, 1993, he was on parole.  Plaintiff remained unaware of his July 1993 validation for another two-and-a-half years.

**E.     1995-1996: Plaintiff's Return to Prison and Administrative Segregation**

18.     On February 25, 2005, plaintiff was arrested and charged with possession and transportation of methamphetamine.  Plaintiff's parole was revoked, and on October 31, 1995, he returned to DVI to await trial.  In March of 1996, a jury convicted plaintiff of possession of methamphetamine, and he received an eleven year sentence.

19.     During the time plaintiff was incarcerated at DVI while he awaited trial and conviction, DVI's Investigation Services Unit ("ISU") reported that CDCR's records indicated that plaintiff was a validated Northern Structure associate.  Pursuant to this report, a 114-D lock-up order was issued on December 28, 1995, placing plaintiff in administrative segregation at DVI.[8]  Plaintiff was given a copy

---

[7] David Tristan, a defense expert, provided slightly different testimony about CDCR procedures. Mr. Tristan testified that CDC officials would not be required to provide an inmate with the 1030 confidential disclosure form until the point that the inmate was advised that confidential information was used as a basis for transfer to the SHU.

[8] Administrative segregation ("Ad-Seg") is a housing unit within every general-inmate population prison that is designed to segregate a prisoner from the rest of the inmate population on a temporary basis. For example, a prisoner can be placed in Ad-Seg while a disciplinary violation is being adjudicated or an incident or threat is investigated.  Security Housing Unit ("SHU"), in contrast, is designed to segregate a prisoner on a long-term basis.  Because validated prison gang members pose a threat to institutional safety, they are placed in SHU confinement on a long-term basis. Until 2003, there

11

United States District Court
For the Northern District of California

1   of the lock-up order, which informed him that he was being placed in Ad-Seg because he had been

2   validated as a Northern Structure associate.  (Ex. 14).  This was the first time plaintiff learned of his

3   gang validation.

4           20.     Plaintiff protested the lock-up order, and stated that some mistake must have occurred,

5   that he knew nothing about the gang validation, and that he had never been associated with the Northern

6   Structure prison gang.  When plaintiff protested the lock-up order, prison officials directed plaintiff to

7   sign a portion of the order waiving his right to an Ad-Seg placement hearing and assured him that the

8   DVI Institutional Classification Committee ("ICC") would meet soon to resolve the matter.  The 114-D

9   form that plaintiff was instructed to sign also indicated that he was "entitled to a written decision

10  including references to the evidence relied upon and the reasons for such confinement" and that "[p]rior

11  to initial placement or within 48 hours of such placement, an inmate is entitled to written notice of the

12  reasons for placement in sufficient detail to enable the inmate to prepare a response or defense."  (Ex.

13  14).  The 114-D lock-up order did not contain any reference to the evidence used to validate plaintiff,

14  and instead simply stated that plaintiff was a "validated Northern Structure associate."  *Id.*

15          21.     Being placed in Ad-seg at DVI (also known as "the hole"), meant being transferred to

16  an isolated, 8' x 6' cell.  Plaintiff testified that the cells were infested with mice and cockroaches, and

17  that the water was a "brackish brown."  (540:12-541:12).

18          22.     Special Agent Ruff testified that upon placement in Ad-seg, an inmate should be

19  provided with copies of all non-confidential documents used to validate him, as well as a 1030

20  confidential disclosure form for any confidential sources.  Other than the lock-up order, however,

21  plaintiff was not provided with any documentation when he was transferred to Ad-Seg.

22

23  **F.**     **ICC Hearings at DVI while awaiting plaintiff's C-file**

24          23.     On January 4, 1996, plaintiff appeared for the first time before DVI's Institutional

25  Classification Committee ("ICC").  The ICC, which is chaired by the warden or the warden's designee,

26  consists of high-ranking prison officials from the prison.  The ICC hears inmate cases concerning

27  placement or retention in administrative segregation, SHU recommendations, and placement or retention

28  _____

were only two prisons that had SHUs, Pelican Bay and Corcoran State Prisons.

1    in SHU confinement, among other things.

2           24.     At the January 4, 1996 ICC hearing, plaintiff denied involvement with the Northern

3    Structure and asked to see the evidence relied upon for his validation. The Committee informed plaintiff

4    that his C-file had not yet arrived, and that they could not review plaintiff's gang status until they

5    received the file. The Committee elected to retain plaintiff in administrative segregation pending receipt

6    and review of his C-file.

7           25.     Over the next six months, until plaintiff's C-file arrived at DVI, prison officials

8    conducted several similar ICC proceedings regarding plaintiff's validation status and placement in

9    administrative segregation.  Plaintiff testified that these ICC hearings generally lasted about five

10   minutes. At these proceedings, officials informed plaintiff that they were still waiting for his C-file and

11   could not consider his status until it arrived.[9]  The ICC told plaintiff that as soon as his C-file arrived,

12   they would provide him with the documentation supporting his validation and would address the issues

13   he was raising.  The ICC also informed plaintiff that he could appeal the ICC's decisions if he wished,

14   and that debriefing – i.e, renouncing gang membership – was the other method of getting out of Ad-Seg.

15   At trial, prison officials could not provide any explanation for why it took at least six months for

16   plaintiff's C-file to arrive at DVI.

17          26.     On March 7, 1996, plaintiff appeared before the ICC and was told that CDCR records

18   showed him as validated.  The ICC elected to retain plaintiff in Ad-Seg, and made a request to a

19   Classification Staff Representative ("CSR") to extend plaintiff's retention in Ad-Seg for 90 days.[10]  The

20   CSR approved this request on April 3, 1996.

21          27.     Also on March 7, 1996, plaintiff complained to Counselor Chavez about not having seen

22   evidence in support of his gang validation.  Chavez gave plaintiff an oral description of the source items,

23   and this was the first time plaintiff learned that a report from Officer Romero of the Merced County Jail

24   was being used as part of the basis for his validation.  However, because the prison did not yet have

25

26          [9]  Several of the hearings were held *in absentia* because plaintiff was at court on the pending
27   drug charges.

28          [10]  A CSR is an individual who travels from prison to prison, reviewing ICC actions and
     recommendations.  The ICC cannot retain an inmate in Ad-Seg beyond thirty days unless the committee
     receives approval from a CSR.

United States District Court
For the Northern District of California

1    plaintiff's C-file, Chavez could not provide plaintiff with actual copies of the source items.[11]

2    28.    On May 31, 1996, plaintiff was paroled to Merced County Jail because of court

3    appearances.  While he was at Merced County Jail, plaintiff spoke to Officer Romero and informed him

4    that a report that Romero had written was being used to validate plaintiff as a gang member and to keep

5    him in Ad-Seg at DVI.  Plaintiff testified that he asked Romero to write a letter explaining that Merced

6    County Jail did not have any information showing that plaintiff was a gang member.  On June 20, 2006,

7    plaintiff returned to DVI from Merced County.

8    29.    Sometime in June 1996, plaintiff's C-file arrived at DVI.  Plaintiff was shown documents

9    from his file relating to two of the validating evidence items – the drawing and Romero's yard incident

10   report.  Plaintiff was not shown the evidence items themselves, but instead he was allowed to read

11   summary descriptions of them in the form of 128-B chronos.

12   30.    On June 27, 1996, plaintiff again appeared before the ICC.  Plaintiff tried to explain that

13   the validating evidence from Officer Romero was wrong, and he told the ICC that he had spoken to

14   Romero, who had affirmed that plaintiff was not identified as affiliated with any prison gang.[12]  The ICC

15   however, informed plaintiff that although his C-file was now at DVI, the file had not been reviewed by

16   the panel for "prison gang membership," and that plaintiff's continued confinement in Ad-Seg was

17   necessary "pending confirm[ation]."  (Ex. 23).  The ICC informed plaintiff of his right to appeal the

18   committee's action, which he did on July 23, 1996.

19   31.    On July 25, 1996, plaintiff appeared again before the ICC.  This time, the ICC informed

20   plaintiff that it had reviewed his C-file and had transmitted a request to SSU to prepare a re-

21   documentation of his prison gang validation by means of an updated CDCR form 128B-2 chrono.  The

22   ICC did not provide any further information as to the reason for the "re-documentation."  The ICC

23   informed plaintiff that once the updated chrono arrived, processing would be complete, his case would

24

25   [11]  Defendant claims that plaintiff received a copy of his 128-B chrono during an inmate appeal
     in March of 1996 from Counselor Chavez, and indeed the inmate appeal form, dated March 7, 1996,
26   states that Chavez provided plaintiff with copies of his validating chronos.  (Ex. 103).  Plaintiff,
     however, maintains that at that time Counselor Chavez merely described the chronos to him, and
27   mentioned that the Merced County incident report had been used as one of the source items in plaintiff's
     validation.
28
     [12]  There was some testimony that Officer Romero agreed to write a letter to CDCR in 1996, but
     the evidence on this point was equivocal and unclear.

United States District Court
For the Northern District of California

1   be referred to a CSR for endorsement, and he would be transferred to Pelican Bay State Prison SHU to

2   serve an indeterminate term for being a validated Northern Structure prison gang associate. ICC elected

3   to retain plaintiff in Ad-Seg and referred the matter to a CSR for endorsement of plaintiff's retention

4   in Ad-Seg. The CSR approved the request on August 1, 1996.

5          32.    Plaintiff filed inmate 602 appeals on July 23 and 29, 1996. These appeals stated that

6   plaintiff had never been informed of any gang validation process or of the actual validation prior to

7   being placed in Ad-Seg in December 1995. Plaintiff also sought to raise objections to the items of

8   evidence used to validate him as a prison gang associate, although he had still not seen any of this

9   evidence. (Ex. 29). Plaintiff also noted again that any report from Officer Romero at Merced County

10  Jail could not be evidence of gang affiliation because Officer Romero knew plaintiff was not affiliated,

11  and that he believed Romero had sent a letter to that effect to CDCR. Plaintiff requested that he be

12  released from Ad-Seg, and that all of the gang validation evidence be removed from his C-file.

13         33.    On July 30, 1996, Counselor Mann informed plaintiff that the prison was still waiting

14  for the updated 128B-2 chrono and the supporting gang validation documentation from SSU. Mann

15  explained to plaintiff that he would receive a confidential-disclosure form (CDC 1030) when the prison

16  received these documents.

17         34.    On August 22, 1996, plaintiff again appeared before the ICC. The Committee noted that

18  the updated 128-B-2 chrono was now in plaintiff's C-file, but that the documents used to validate him

19  were not. The committee elected to retain plaintiff in Ad-Seg pending receipt of these documents.

20         35.    On August 23, 1996, Correctional Counselor Darlene Best interviewed plaintiff regarding

21  his 602 appeals. Plaintiff told Best that any report from Officer Romero should not be used as evidence

22  of gang association, and he once again requested access to all of the evidence used to support the

23  validation. Plaintiff testified that Best told him that she would undertake an investigation of the issues

24  plaintiff raised; however, Best denied his appeal at the first level that day. In her written statement of

25  denial, Best noted that SSU had been requested to re-document plaintiff's validation because the initial

26  July 1993 validation did not meet current CDCR regulations.[13] The appeal denial stated that "Until your

27

28                [13] The chrono was deficient in that it did not specifically state which items of evidence had and had not been been relied on in the validation process.

gang status is fully investigated and a determination is made by SSU, you are considered a threat to the safety and security of the institution."  (Ex. 24).

### G.    Plaintiff's Gang Re-validation in September 1996

36.    On September 4, 1996, SSU agent Olson "re-validated" plaintiff as a Northern Structure prison gang associate by issuing a  new 128-B-2 chrono.  (Ex. 34).  Although never explained to plaintiff, the only validation requirement addressed in the re-validation process concerned the manner in which the original 128-B validation chrono form had been completed.  The original form failed to specifically list or identify which of the four evidence items submitted had been relied on by SSU in 1993 and which, if any, had not.[14]  Olson did not reinvestigate any of the three source items used to re-validate plaintiff as a Northern Structure prison gang associate.

37.    On September 27, 1996, DVI Warden Alameida denied plaintiff's appeal at the second level, noting that indeterminate placement in Ad-Seg was proper based on the updated 128-B-2 chrono.  At trial, Alameida testified that in evaluating such inmate appeals, he did not reinvestigate validations because that was not his responsibility.  Rather, he assumed that the IGI had done a thorough and proper job, as evidenced by the fact that the 128-B chrono had been authored.  Alameida's practice was to deny appeals unless something seemed awry with a particular case.  If something needed to be reinvestigated, he routed that through an IGI because he was not a gang specialist.

38.    On January 24, 1997, the Inmate Appeals Branch, CDCR's highest level of review, denied plaintiff's appeal, stating that the "documentation reveals that on July 2, 1996,[15] an Institutional Gang Investigator collected and documented information reflecting [plaintiff's] involvement in an inmate prison gang.  That documentation was reviewed by the [ICC].  On September 4, 1996, the documentation was reviewed by a SSU Special Agent who confirmed and validated [plaintiff] to be an Associate of the NS Prison Gang. [Plaintiff's] case factors were reviewed by a Classification Staff

---

[14]  This documentation requirement followed from *Madrid v. Gomez*, 889 F. Supp. 1146, 1279 (N.D. Cal. 1995), where the court discussed the risk of mistaken re-validation based on previously rejected evidence items under the prior 128-B chrono format.

[15]  It appears that this is a typographical error, as IGI Smith prepared the original validation package on July 2, 1993.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Representative [CSR], who subsequently endorsed [Plaintiff] to SHU as his conduct endangered the safety of others and the security of the institution."  (Ex. 29).

39.     At no point while he was housed in administrative segregation at DVI was plaintiff given a meaningful opportunity to present his views; to the contrary, the ICC spent six months telling plaintiff they could not consider his gang status until his C-file arrived, and then told plaintiff that once his chrono arrived he would be transferred to Pelican Bay SHU.  Nor did the ICC address the fact that plaintiff never had the opportunity to present his views to the IGI (or, indeed, to *anyone*) before he was formally validated as a gang member.

40.     Between December 28, 1995 and September 23, 1996, plaintiff spent approximately four months in DVI Ad-Seg as a result of the gang validation.

41.     On September 19, 1996, plaintiff appeared before the ICC at DVI for the last time.  ICC imposed an indefinite SHU term based on plaintiff's gang validation, and directed his transfer to Pelican Bay, one of two facilities that had a SHU.  A CSR endorsed plaintiff's placement in Pelican Bay SHU on September 20, 1996.  On September 24, 1996, plaintiff arrived at Pelican Bay State Prison to serve the remainder of his prison sentence in the SHU.

**H.     Reviews of Validation while at Pelican Bay SHU**

42.     Following his transfer to Pelican Bay SHU, plaintiff continued to appear before various panels of the ICC and the Unit Classification Committee ("UCC") for periodic reviews of his confinement status.  These reviews occurred on the following dates: September 27, 1996, February 20, 1997, August 5, 1997, March 31, 1998, May 14, 1998, September 24, 1998, December 8, 1998, April 6, 1999, August 10, 1999, November 17, 1999, May 31, 2000, November 8, 2000, May 15, 2001, October 17, 2001, April 9, 2002, October 12, 2002, April 8, 2003, September 10, 2003, and March 30, 2004.  Plaintiff's placement in the SHU was re-endorsed by a CSR on the following dates: March 26, 1997, January 26, 1999, February 1, 2000, December 13, 2000, December 13, 2001, November 11, 2002, and October 27, 2003.

43.     On September 27, 1996, plaintiff appeared for the first time before the ICC at Pelican Bay.  The ICC explained that plaintiff was being housed in the SHU because he was a validated gang

member.  Plaintiff denied that he was a gang member, and asked for documentation supporting his validation.  The ICC told plaintiff he could see the documentation through an *Olsen* review[16] of his C-file.  Plaintiff asked for an opportunity to refute his validation, but the Committee said they needed his C-file, and that he would have to take it up with his counselor.  The ICC informed plaintiff that if he wanted to get out of the SHU, he could debrief.  (Ex. 40).

44.  On October 18, 1996, plaintiff was provided with an *Olsen* review of his C-file.  This was the first time plaintiff saw any of the actual documents supporting his gang validation.  During this review, plaintiff was provided with copies of his 128-B validating chrono, the drawing purportedly containing gang symbols, and the Merced County incident report.  He was also provided with a 1030 disclosure form regarding the September 1992 debriefing report.  The 1030 form stated that "[d]uring a debriefing, an inmate identified you as a Northern Structure."  This was the first time plaintiff learned of the existence of the debriefing report.[17]  (Ex. 41).

45.  In early March 1998, plaintiff was transferred from Pelican Bay SHU to Merced County Jail for a re-sentencing hearing on his conviction.  While there, plaintiff spoke again with Officer Romero regarding the April 1992 yard incident and Officer Romero's report that had been relied on by CDCR as one of the validating evidence items.

46.  In response, Officer Romero offered to write a letter to CDCR, which he did and gave to plaintiff at the Merced County Jail.  The letter is dated March 8, 1998, written on Merced County Sheriff's Department letterhead, and addressed to "Classification" regarding "Gang Member Status of Ernesto Lira."  The letter reads in full:

> To Whomever It May Concern;
>
> In checking with the Classification Department, we cannot find any gang validation on Ernesto Lira in Merced County Jail.  Lira was always housed in general population with other Northern Hispanics, which is the majority of our jail.  I hope this letter will clarify any misunderstandings you might have.  Thank you.

---

[16]  An *Olsen* review is a procedure that allows inmates to "review" their C-files.  This process does not allow inmates to actually look through their files.  Rather, a prison official brings the file in on a cart and the inmate may specifically request a document from the file.

[17]  The parties' stipulated facts state that confidential disclosure forms "were issued" on September 19, 1996 and October 18, 1996.  At trial, plaintiff testified that he did not receive any confidential disclosure forms until his *Olsen* review on October 18, 1996.

1      R. Romero, C.O. II

2  (Ex. 49).

3      47.      Plaintiff testified that when he returned to Pelican Bay, he provided a copy of Officer

4  Romero's letter to a UCC panel at a March 31, 1998 hearing.  The panel refused to consider the letter,

5  and informed plaintiff that if he wanted to pursue the matter, he could file another 602 appeal.  (Ex. 50).

6

7  **I.      Plaintiff's April 1998 602 Appeal**

8      48.      On April 4, 1998, plaintiff filed another 602 inmate appeal of his gang validation and

9  segregation.  This appeal raised issues about the evidence used to validate plaintiff, and attached the

10  March 8, 1998 letter written by Officer Romero stating that Merced County Jail did not have any records

11  of plaintiff's gang affiliation.  IGI Mark Piland, who handled plaintiff's appeal at the first level,

12  reviewed plaintiff's C-file, examined the source items, and interviewed plaintiff.  IGI Piland concluded

13  that Officer Romero's 1998 letter did not affect the use of the 1993 Merced County incident report

14  because that report showed that plaintiff was in the presence of a validated Northern Structure member

15  and "assisting in NS business by questioning Southern Mexican inmates on their tattoos and where they

16  were from." (Ex. 52).  Officer Piland found it irrelevant that Merced County Jail had no official records

17  of plaintiff's gang status.[18]  On August 6, 1998 IGI Piland denied plaintiff's appeal in its entirety at the

18  first level.

19      49.      Although Piland testified that he judged each source independently, there is no evidence

20  that Piland made any independent investigation in connection with the appeal except for a telephone call

21  to Officer Romero to confirm that he had in fact authored the letter.  Romero replied that he had, and

22  Piland did not ask him any further questions.  Moreover, Officer Piland stated in his appeal response

23  that his reason for denying the appeal is that the validation items "clearly meet [CDCR departmental]

24  _____

25      [18] On July 29, 1998, Piland filled out a fax cover sheet addressed to SSU (Ex. 53), and although
    Piland wrote "C + 10" on the cover sheet, he testified that he did not remember what 10 pages were sent
26  with the cover sheet.  The message on the cover sheet – which Piland testified was not in his
    handwriting – states "Re Lira, H-36693: One of the sources used for validation has been rescinded by
27  the author . . . a new source has been sent with this Fax, see debrief page 4 (yellow tag) . . . note this
    inmate has a 602 going." (Ex. 53).  What appears to be a reply message on the fax cover sheet reads:
28  "8-3-98 Old source still usable to show assoc[iation]. . . didn't redo 128B 2 based on info. S/SW." _Id._
    Although Piland denied knowledge of this message, he recognized the handwriting as that of SSU
    Special Agent-in-charge Steve Wohlwend.

regulations." (Ex. 52). Officer Piland reviewed each document to see if it met departmental criteria, but he did not investigate the veracity of any of the documents.[19]  On September 21, 1998 plaintiff's appeal was denied at the Warden's level.

**J.      April 2000 Inactive Status Review**

50.      On November 17, 1999 the ICC reviewed plaintiff's case for inactive gang status.  The committee noted that plaintiff's validation might be in question because the 1993 Merced County incident report "appears to possibly be in conflict" with the March 3, 1998 letter sent by Officer Romero.  (Ex. 61).  The ICC recommended that SSU/Law Enforcement and Investigations (LEIU) "evaluate this information when S is being reviewed for inactive status," but also noted in its recommendation that plaintiff "contested being evaluated as an inactive prison gang associate stating, 'How can I be a non-active gang associate when I am not part of this gang?'" *Id*.

51.      In March of 2000, Assistant IGI Brian Fielder was assigned plaintiff's case as part of his work for the Inactive Gang Task Force at Pelican Bay SHU.  Fielder's review consisted of looking at plaintiff's C-file to see if there was any evidence of gang activity within the last six years.[20]  Fielder also interviewed plaintiff for approximately 30 minutes to one hour.  During this interview, Fielder explained the review process, and plaintiff stated that he was not a gang member.  Fielder also conducted a cell search, ran plaintiff's name through the Cal-Gang database and the Western States Information Network database, and contacted Merced County Jail authorities, the Merced County Parole Office, and SSU Officer Olson.  None of these efforts turned up any evidence of gang activity or affiliation.

52.      However, during his investigation, Fielder discovered another item of evidence that purportedly supported plaintiff's gang validation.  This evidence consisted of a confidential inmate

---

[19] This is consistent with former Warden McGrath's testimony.  McGrath testified that even at the first level, these appeals are "really a procedural review."  Even though officers had to look at the evidence, they were primarily trying to determine whether "all the components are there as they should be."  (708:9-20)

[20] This inactive review was the result of the settlement in *Castillo v. Alameida*, No. C 94-2847 (N.D. Cal. 1994).  Prior to that settlement, the only way for an  inmate to get out of the SHU was to debrief or to complete his sentence.  After *Castillo*, IGIs reviewed inmates for inactive status once every six years.  If no record of gang activity was found, the IGI would validate the inmate as inactive and refer him to the Director's Review Board for determination of whether he should be released from the SHU.

United States District Court
For the Northern District of California

20

United States District Court
For the Northern District of California

debriefing report dated April 1, 1998, which described plaintiff attacking his cell-mate at the direction of another non-validated Northern Structure affiliate, and recounted other gang related activity by plaintiff, such as plaintiff teaching the Northern Structure "bonds" to other inmates and mailing a threatening letter to the debriefing inmate's mother. Fielder recommended that plaintiff be retained as an active gang member based on the 1998 confidential debriefing report. (Ex. 63). Fielder testified that he did not reevaluate or reassess the reliability of the source items used for plaintiff's original validation because that was not part of his job. Nor did Fielder investigate the truth of allegations in the April 1, 1998 debriefing report. Fielder's goal in conducting inactive review of plaintiff was not to conduct an independent review of plaintiff's validation. Rather, it was to see if there was evidence of any gang activity in the last six years. Officer Fielder informed plaintiff of his review and recommendation, and on May 25, 2000, gave him a 1030 disclosure form for the April 1, 1998 confidential memorandum. This was the first time plaintiff was made aware of the April 1, 1998 debriefing report.

53.     In November 2001, a Northern Structure affiliate debriefed; the confidential debriefing report mentions plaintiff's name in the narrative and the "laundry list." (Ex. 70). The narrative identifies plaintiff as a Norteño, and states that the debriefing inmate was ordered to assault plaintiff "due to Lira assaulting a NF member in the past." *Id.* The narrative does *not* identify plaintiff as a member of NS. In the "laundry list," the "status" category next to plaintiff's name is blank; most individuals listed in the "laundry list" are identified as being a member of one of three prison gangs, and are identified as "associate," "member," or "dropout."

**K.     Plaintiff's November 2002 602 Appeal**

54.     On November 18, 2002 plaintiff filed another 602 inmate appeal challenging his validation and seeking release from the SHU. This appeal was denied at both the first and second levels.

**L.     Plaintiff's Experience in the SHU**

55.     In the SHU, inmates are housed in small, barren cells, which plaintiff described as "cement tombs." The cells contained a hard cement bed with a two-inch mattress. There was no other furniture and no windows. Meals were eaten alone inside the cell, served twice a day by guards on trays

1  pushed through a cell-door slot.  Inmates were confined to their cells for about 22 1/2 hours every day.

2  They could leave their cells only to shower, go to a medical appointment or administrative hearing, or

3  go to the yard.  Ten minute showers were allowed three times a week.  The "yard" was a 9' by 48'

4  cement space, with eighteen-foot walls and no windows.  The inmates were permitted to exercise, alone,

5  in the yard; plaintiff testified that he "walked in circles" in the yard.[21]  (927:13-929:25).  Plaintiff also

6  testified that "[t]he only time you could [look] up and see some sky was when you were on the 'yard';

7  there were no windows in the cell or in the 'pod.'" (936:13-18).

8          56.    Inmates also were occasionally allowed access to the law library.  They were allowed

9  to go about once a month, and were taken there by guards in a chain-gang fashion.  Inmates were strip-

10  searched and handcuffed every time they left their cells.  There were no work, education or drug

11  rehabilitation programs for inmates.  Possessions were limited to six cubic feet, and books were allowed

12  but were strictly limited.  Inmates could order them through a catalogue but would have to be approved

13  by prison officials and would take several months to arrive.  Inmates were not allowed to use the

14  telephone, and visitation privileges were limited.  Due to the remote location of Pelican Bay, it was

15  practically impossible for plaintiff's family to visit him.

16          57.    Plaintiff testified that he would wake up at 5:30 a.m. every morning and write in his

17  journal.  He wrote in his journal for his children, so they would know he had not forgotten about them.

18  Plaintiff was housed near mentally ill patients in the SHU who often screamed or banged repeatedly on

19  things in their cells.  Because of this noise, plaintiff had trouble sleeping.  For plaintiff, the worst thing

20  about being in the SHU was that he had no communication with his family.  As years passed, plaintiff

21  became less focused, and he started to worry that experiences would come back to haunt him.

22          58.    Violence in the SHU was common.  Former Pelican Bay Warden Joseph McGrath

23  testified that beginning in February 1997, there was "a rash of in-cell homicides" at Pelican Bay SHU.

24  In December 1997, plaintiff witnessed through the window in his cell door a deadly gang-directed

25  strangulation assault.  Plaintiff testified, "[t]hat's something I'm never going to forget . . . it's going to

26  stay with me the rest of . . . whatever time I have left. . . . You wonder, are you next? . . . you live on

27  a tightrope, you know, there's always the tension that your door is going to be popped open." (952:11-

28

---

[21]  Plaintiff described the size of the yard as "three paces by sixteen paces." (927:13-929:25).

22

25).

59.     Plaintiff's SHU confinement placed him in a concentrated population of prison gang members and associates. In February 1999, plaintiff was the victim of a cellmate assault that had been directed against him by a Northern Structure member because of plaintiff's refusal to associate with the gang. Following that incident, plaintiff was placed on permanent single-cell assignment, and for the last five and a half years of his incarceration at Pelican Bay he served his time in solitary confinement.

60.     In February 2003, prison officials notified plaintiff that his name appeared on a "bad standing" or "hit list" with the Nuestra Familia and Northern Structure. (Ex. 70, 110). Individuals appearing on such a list were subject to assault by NF and NS members.

## M.     2004 Weapons Charge, Parole, and Return to Administrative Segregation

61.     On January 20, 2004, Officer Morrison reported that plaintiff tampered with a shaving razor by taking out the razor and replacing it with a thin foil. A strip search and cell search turned up nothing, and plaintiff was placed on a 3 day "potty watch" surveillance, in which he was placed in a plexiglass cubicle and allowed only water and food until he produced three stool samples for inspection; no razor strip materialized. SHU staff referred the matter to the Del Norte County District Attorney, who charged plaintiff with inmate possession of a deadly weapon. Plaintiff was given a plea offer of eight more months in the SHU, and was advised that if the offer was rejected and plaintiff was convicted at trial, he could face a sentence of 12 more years. Plaintiff rejected the plea offer, and testified that "I couldn't stand being there eight more months." (988:2-13). Plaintiff was acquitted at a jury trial on April 13, 2004.

62.     On April 14, 2004, plaintiff paroled from the Pelican Bay SHU. Plaintiff went home to live with his mother in Planada. His sister Lucy stayed at the house every other weekend and noticed that her brother was very different. Once gregarious and fun, plaintiff now spent all his days alone in his bedroom. Many people came to visit him but he did not want to see any of them. Instead, he mumbled hello and then retreated to his bedroom. He refused to go to public places, such as out to dinner, the movies, or the store. Moreover, plaintiff could not sleep; plaintiff's sister Lucy testified that she would often wake in the night to find him pacing around the house. Plaintiff's sister Irma tried to

1    obtain sleep medication through the Merced parole office, but received no assistance.

2         63.    In May of 2005 plaintiff's parole was revoked and he returned to DVI where he was

3    placed in administrative segregation due to his gang validation.  Over the next two and a half years

4    plaintiff was released on parole and reincarcerated for parole violations several times.  On each

5    occasion, plaintiff was returned to administrative segregation because of his gang validation and was

6    issued a 114-D form notifying him of the reason for segregation.  Plaintiff also appeared before the ICC

7    in 2005 and 2006.

8         64.    Plaintiff's disciplinary prison record for these reincarcerations continued to show no

9    history of any gang activity or gang affiliation, and in July of 2007, plaintiff was reviewed again for

10   "inactive" gang status.  Following an investigation, which found that "the date of the last documented

11   gang activity was 04/01/98 and there is no evidence of recent Northern Structure gang activity,"  a

12   change to inactive status was recommended and approved.  (Ex. 97).

13

14   N.    **Plaintiff's Mental Health**

15        65.    Plaintiff had numerous prison mental health screenings prior to his transfer to the SHU

16   at Pelican Bay; none of these screenings indicated that plaintiff suffered from mental illness.

17        66.    Upon plaintiff's return to DVI for a parole violation in August 2005, plaintiff was

18   examined by mental health personnel who diagnosed plaintiff with depression and post-traumatic stress

19   disorder ("PTSD").  During this psychiatric examination, plaintiff described certain traumatic events

20   that he had experienced while in the SHU which recurred to him as "flashbacks . . . nightmares . . .

21   voices calling" and he reported that "somebody was killed in front of me . . . gang was after me . . . they

22   wanted to kill me."  (770:10-25; 785:22-786:10).

23        67.    Although plaintiff's medications were adjusted periodically over the years, plaintiff

24   remained under the same anti-depressant drug regime and under the same clinical diagnosis and ongoing

25   treatment by CDCR mental health staff until his discharge in March 2008.  Since then, plaintiff's

26   treatment, including his prescribed medications, has been continued under private mental health care.

27        68.    CDCR diagnoses of plaintiff's depression and PTSD have been confirmed by more recent

28   assessments during the course of this litigation.  Plaintiff's designated expert, Paul Good, Ph.D., a

clinical psychologist, conducted an evaluation of plaintiff that included a medical records review, in-depth interviews of plaintiff and his family and friends, and a battery of diagnostic tests. Dr. Good concluded that plaintiff suffers both from PTSD and a dysthymic disorder (the intermediate level of clinical depression identified in the DSM IV); Dr. Good has also concluded that plaintiff's confinement in the Pelican Bay SHU for eight years was the cause of these disorders. Dr. Good identifies two traumatic "stressor" events as underlying plaintiff's PTSD and "flashbacks": the strangulation murder that he witnessed outside his cell door in 1997, and the three day "potty watch" experience in 2004 when plaintiff was suspected of tampering with the razor blade.

69.    Dr. Good's conclusion is also supported by the evaluation of plaintiff's second mental health expert, Craig Haney, Ph.D., a psychologist and nationally-recognized authority on the mental health effects of prolonged confinement in the severely isolating conditions of SHU and other "supermax" prisons. Dr. Haney's evaluation was based on a large and developing body of psychological research establishing that such conditions of confinement can cause symptoms of post-traumatic stress disorder in prison inmates subjected to SHU confinement for extended periods. In Dr. Haney's opinion, this "SHU syndrome," as it as come to be known, involves the same symptoms of depression, anxiety, hyper-vigilance, auditory hallucination and agoraphobia that plaintiff has suffered since his release from Pelican Bay SHU in 2004.

70.    Both Dr. Good and Dr. Haney have opined that plaintiff's mental state would significantly benefit from a public finding by the Court that his gang validation was wrongful, and from an order that CDCR expunge that gang validation from his records. It is both doctors' opinion that a judicial declaration and expungement would help plaintiff deal with his ongoing symptoms of depression and PTSD. Both doctors based their opinions on their diagnostic evaluations of plaintiff, as well as the literature on the beneficial psychological effect of exoneration following wrongful conviction and studies on truth-and-reconciliation commissions over human rights abuses.

**O.    Testimony and Expert Evaluation of CDCR's Validating Evidence**

      **1.    The Drawing**

71.    CDCR regulations authorize as validating evidence gang "[t]attoos and symbols . . .

unique to a specific prison gang." Cal. Code of Regs. Title 15 § 3378(c)(3)(B). (Ex. 121). The drawing confiscated from plaintiff's locker in December 1992 is supposed to include three Northern Structure symbols: a "Northern Star," the number "14," and part of a "Huelga bird." The chrono prepared for the drawing identifies only two gang symbols hidden in the drawing: the number "14" and the "Northern Star," and does not mention the Huelga bird. (Ex. 8).

72.     The chrono describing the search of plaintiff's locker states that plaintiff "freely admitted creating" the drawing. [22] However, the Court is persuaded by the testimony at trial that plaintiff did not create the drawing, and that plaintiff only admitted to possessing the drawing, not creating it. Plaintiff testified that he did not create the drawing, and indeed the "original" drawing taken from plaintiff's locker was itself a photocopy. This is consistent with inmate Freddie Leyba's testimony, described below, that he created the drawing and made copies of the drawing for various people. Former SCC Officer Robert Gordon, who had confiscated the drawing from plaintiff's locker, testified that plaintiff asked for "his" drawing back. When asked whether plaintiff admitted creating the drawing, Officer Gordon answered "no." IGI Smith, who investigated plaintiff's initial validation, did not independently investigate whether plaintiff made the drawing. Inmate Freddie Leyba testified that he created the drawing, and that he did not intend to put gang symbols in it. Leyba testified that he intended to put the number "14" in the drawing to refer to the fourteenth letter of the alphabet, "N," for Norteños, or Northern California Mexicans, not as a gang-related symbol. He testified that he did not intend the headband to say "Chino" and that he was not referring to plaintiff.[23]

73.     Witnesses at trial were able to identify the purported "gang symbols" in the drawing with varying degrees of success. IGI Smith, who investigated plaintiff's initial validation, was able to locate the Huelga bird and the letters "h-i-n" (from Chino) in the drawing at trial, but was unable to locate the Northern Star. Smith testified that in 1993 he did not know that the Huelga bird was used as the logo

---

[22] At trial no one could explain why the chrono for the drawing was created in May of 1993, five months after the drawing had been confiscated, although Officer Smith testified that this delay was not unusual nor did it cause him to question its accuracy. Because the chrono was created five months after the locker search, it is possible that plaintiff's admission that the drawing was "his" became mistakenly remembered as an admission that plaintiff created the drawing.

[23] It is not clear whether Leyba knew plaintiff at the time he made the drawing, because he worked on it periodically from time to time, and thus different parts were made at different times. (318:10-22).

United States District Court
For the Northern District of California

1    of the United Farm Workers.

2        74.    Officer Covello was able to locate the number "14" and "what appears to be the Northern

3    Star," but – contrary to some other CDCR witnesses – he saw this symbol on "what appears to be a

4    man's face . . . near his eye." (146:12-147:10; 148:19-149:2, Ex. 115).  SSU Analyst Olson, who

5    validated plaintiff in 1993 and again in 1996, and who testified about her extensive training "on

6    identifying gang symbols," could not find any gang symbols in the drawing, even when presented with

7    a 30" by 40" blowup of the drawing.  (85:1-15).  Olson testified that she could see a "h" "i" and "n" in

8    the headband.  Finally, Special Agent Ruff saw a part of a Huelga bird on the bandana, and the numbers

9    "1" and "4" in the drawing.  After being shown a highlighted version of the drawing, Ruff also saw a

10   Northern Star on the elbow of the individual in the picture who is lying on his palms.

11       75.    At some point during his incarceration, plaintiff discovered that another drawing had

12   mistakenly been placed in his C-file.  This drawing contains the name of the prison gang "Nuestra Raza"

13   printed prominently at the top of the drawing, and a clearly identifiable Huelga bird, and appears to have

14   come from a cell-search of inmate Juan Morales, a validated NS member.  (Ex. 120).  The evidence at

15   trial established that there was a handwritten notation that appears to have been made originally on the

16   back of the drawing as confiscated, but was then photocopied on a separate page as later forwarded to

17   CDCR.  The notation reads: "This is a copy of a drawing that was confiscated from Morales, Juan

18   property during  a cell search 16/6/91.  Romero, R. 5340."  (Ex. 120).  Although this drawing was

19   purportedly not used in plaintiff's original validation, there is evidence suggesting that this drawing

20   might have been confused for the drawing confiscated from plaintiff's locker.  There is a handwritten

21   notation in the lower righthand corner of the drawing that states "See 128B dated 5-10-93"; that chrono

22   is the chrono created for the drawing by Leyba.  (Ex. 120).  At trial, no one from CDCR could explain

23   who made the notation, or when or why.  Moreover, while it is CDCR's position that this drawing was

24   not used to validate plaintiff, no one at CDCR could explain why a picture containing obvious gang

25   symbols and mistakenly believed to be plaintiff's and contained in his C-file was not used to validate

26   him.[24]

27

28        _____

         [24] Indeed, CDCR took the position at trial that the Nuestra Raza picture was plaintiff's. (1027-
    1034).

76.     Plaintiff's expert on California prison gangs, California prison administration, and the validation process, Daniel Vasquez, testified about the value and reliability of the evidence items used to validate plaintiff.  Mr. Vasquez is the former warden of San Quentin State Prison, and has spent over 36 years in various investigative and management positions at a number of facilities throughout the CDCR system, as well as county jail and federal facilities.  It is Vasquez's opinion that the "gang symbols" in the drawing are either ambiguous or not gang symbols at all.  Mr. Vasquez noted that the number "14" represents the 14th letter of the alphabet and stands for the letter "N" or "Norte," Spanish for the North.  Mr. Vasquez stated that he symbol "14" is not used exclusively by the Northern Structure or other prison gangs, or even street gangs, but is instead frequently used to refer to Norteños, or Northern California Hispanics generally.  Mr. Vasquez stated that the "14" symbol is commonly found as graffiti in playgrounds and elsewhere in the community.  Similarly, Mr. Vasquez stated that the "Huelga bird" is a popular symbol widely used in Hispanic culture and by California farm workers.  Mr. Vasquez also could not find a "Northern Star" in the drawing.  Mr. Vasquez opined that due to the absence of the Northern Star, and the fact that the Huelga bird and the number "14" are symbols associated with Mexican-Americans and not exclusive to the Northern Structure, the drawing was not a reliable validation source.[25]  The Court finds Mr. Vasquez's expert testimony credible and persuasive.

77.     Based upon all of the evidence and testimony at trial, the Court finds that the drawing does not contain a Northern Star, and that the other symbols – the "14" and the Huelga bird – are obscure and of ambiguous meaning.  The Court finds that the drawing is not reliable evidence of plaintiff's affiliation with the Northern Structure prison gang.

### 2.      Reports about April 24, 1994 Merced County Jail Yard Incident

78.     As discussed above, Officer Romero prepared two versions of the report of the April 24, 1992 incident.  The handwritten report, written the same day as the incident, identifies two other inmates – Morales and Hernandez – as the primary participants, and merely lists plaintiff as one of eight inmates involved.  (Ex. 1).  The handwritten version does not record that plaintiff made any statements to

---

[25] CDCR regulations authorize as validating evidence gang "[t]attoos and symbols . . . unique to a specific prison gang."  Calif. Code of Regs. Title 15, § 3378(c)(3)(B), Ex. 121.

United States District Court
For the Northern District of California

Romero during the incident.  The typewritten version, prepared almost a year after the incident and in response to IGI Officer Smith's telephone request for any information about plaintiff, identifies plaintiff and Morales as the two inmates "that were doing the most," and quotes plaintiff as commenting to Officer Romero as the altercation was broken up, "Come on Romero.  All we wanted to do was play with them a little while.  You know when we go to the 'pen' they (meaning Surenos) rush us from the gate." (Ex. 6).

79.     When IGI Smith was investigating plaintiff's gang validation and received Officer Romero's typewritten April 13, 1993 report, he was not aware of the handwritten version.  At trial, Smith testified that he had not seen the handwritten report until "just recently," and that because the incident in the typed report is "described totally different" than the handwritten report, Smith wondered if the two reports described "two separate incidents."  (262:22-263:11).  Despite remarking on the differences between the two reports, Smith also testified that if, in 1993, he had seen the contemporaneous handwritten report, it would not have caused him to question the accuracy or reliability of the typed version prepared a year later.  Smith also testified that he had been trained to do further investigation of any item of potentially validating evidence that might have implausibilities or other issues about its reliability.

80.     Mr. Vasquez testified that it was his expert opinion that even the typed Romero report was not a reliable indicator of gang activity sufficient to be part of a validation package because "there was really no incident that took place . . . it was just some bad looks maybe being given . . . and there was really no confrontation."  (1053:24-1055:1).  Mr. Vasquez testified that the reliability of the typed report was further brought into question because it was created nearly a year after the yard incident, and because of the significant differences between the original handwritten report, which did not identify plaintiff as a main participant in the incident, and the typed report, which does identify plaintiff as one of two main participants.

81.     The Court finds that the typed report is not a reliable piece of evidence supporting plaintiff's gang validation.  First and foremost, the Court finds it important that the author of the report, Officer Romero, testified that when he prepared the reports, he did not intend to indicate that plaintiff was a member of a prison gang.  The Court also finds it significant that after Officer Romero learned

29

United States District Court
For the Northern District of California

that plaintiff was validated as a gang member and housed in Ad-Seg in part due to his April 13, 1993 report, Officer Romero wrote a letter to inform CDCR that "we cannot find any gang validation on Ernesto Lira in Merced County Jail. Lira was always housed in general population with other Northern Hispanics, which is the majority of our jail. I hope this letter will clarify any misunderstandings you might have." (Ex. 49). In addition, the significant differences between the handwritten contemporaneous report and the typed report, which was prepared almost a year after the incident, remain unexplained.

### 3. The September 1992 Confidential Inmate Debriefing Report

82. The September 25, 1992 inmate debriefing report is the third original item of validating evidence. Plaintiff's name appears in a long "laundry list" of alleged prison-gang affiliates; plaintiff is not mentioned or described anywhere in the narrative portion of the report. A different inmate named Lira, however, is mentioned in the narrative portion of the report, and does not appear in the "laundry list."

83. This kind of "laundry list" identification is no longer used by CDCR, following the *Castillo* settlement.

84. The debriefing IGI officer, Reyes Hernandez, testified that he determined that the debriefing inmate responsible for the "laundry list" was a reliable source in part because he incriminated himself in criminal activity. However, IGI Hernandez also testified that, consistent with CDCR practice, he did not give the debriefing inmate a *Miranda* warning. IGI Hernandez also found the debriefing inmate reliable because thirteen pieces of information provided by the inmate were corroborated. None of the thirteen pieces of information related to plaintiff. All of the thirteen pieces of information were corroborated by written CDCR reports of past incidents: four of the incidents involved the debriefing inmate, and eleven of the thirteen incidents dated from 1981 and 1982.

85. In the laundry list, plaintiff is identified as being "Cat 3," which according to defense expert Robert Marquez, meant that plaintiff was the equivalent of a "commanding officer" in the Northern Structure. Mr. Marquez testified that Category 3 individuals "have overall authority . . . they're responsible for the overall security of the area, and they are the ones that are directly reporting

United States District Court

For the Northern District of California

1    to the Nuestra Familia." (1783:15-20).  Marquez testified that he found the debriefing report reliable

2    with respect to the information provided about plaintiff because DVI housing records showed that the

3    debriefing inmate and plaintiff were both housed at DVI for several months in 1992.  However, Marquez

4    also acknowledged that the debriefing inmate would have been in Ad-Seg at the time, while plaintiff

5    was housed in the reception area.

6          86.    Vasquez opined that the "laundry list" identification of plaintiff as gang affiliated is of

7    no reliable evidentiary value because there was no corroboration of plaintiff's inclusion in the laundry

8    list.

9

10                     **4.    The 1998 Confidential Inmate Debriefing Report**

11         87.    The fourth item of evidence that CDCR has identified as validating plaintiff's gang status

12   is the April 1, 1998 confidential inmate debriefing report, which describes how plaintiff allegedly

13   followed the direction of a Northern Structure gang member in carrying out an assault on a new cellmate

14   while housed in Pelican Bay SHU.  The 1998 report was relied on during the April 2000 "inactive

15   status" review as the basis for finding plaintiff was still an active Northern Structure associate.

16         88.    The debriefing report does not name the inmate victim or provide the date or time frame

17   of the assault.  During discovery in this case, CDCR produced Pelican Bay SHU cellblock activity logs

18   for October 7, 1997, which include references to plaintiff "fighting" with a newly-assigned cellmate,

19   Anthony Ramirez. (Ex. 44).  CDCR records, however, suggest that there was no assault.  According

20   to the form 115 Rules Violation Report, plaintiff was accused of slapping Ramirez when Ramirez was

21   moving his things into plaintiff's cell.  (Ex. 45).  Plaintiff denied striking Ramirez, and after an

22   investigation and a hearing, the disciplinary charge against plaintiff was dismissed. *Id.*  The findings

23   state that "Reports do not contain any evidence that physical contact was made by either inmate" and

24   that "Reports do not mention an argument or any sign of hostility between LIRA and RAMIREZ." *Id.*

25         89.    There was no evidence at trial supporting the debriefing report's account of plaintiff

26   assaulting a cellmate.

27

28

31

1

**CONCLUSIONS OF LAW**

2

**I.      Mootness**

3        Defendant contends that regardless of whether plaintiff was deprived of due process while he

4   was incarcerated, his claims for declaratory and injunctive relief are moot because he is no longer in

5   prison.[26] Under Article III, section 2 of the Constitution, federal courts have jurisdiction of matters only

6   if they present an actual "case or controversy." This "case-or-controversy requirement subsists through

7   all stages of federal judicial proceedings, trial and appellate. . . . The parties must continue to have a

8   personal stake in the outcome of the lawsuit." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990)

9   (internal quotations omitted). "This means that, throughout the litigation, the plaintiff 'must have

10  suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by

11  a favorable judicial decision.'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis*, 494 U.S. at

12  477).

13       A released inmate may avoid mootness if "some concrete and continuing injury"– some

14  "collateral consequence" of his confinement – exists. *Spencer*, 523 U.S. at 7. Plaintiff's claims for

15  declaratory and injunctive relief, therefore, will not be moot if plaintiff has demonstrated some

16  "collateral consequence" that continues beyond his release from confinement and is likely to be

17  remedied by a favorable judicial decision. *See id*. at 7. Plaintiff argues that declaratory judgment and

18  expungement are proper (and, therefore, that the case is not moot), because these remedies will mitigate

19  the danger of retaliatory gang violence, and because they will have a favorable impact on his mental

20  health.

21       The Court concludes that plaintiff's claims are not moot because a judicial declaration and

22  expungement will mitigate plaintiff's risk of gang reprisal. Plaintiff was placed on the NF prison gang

23  "no good" list, which as CDCR recognizes, placed him at risk of assault by gang members while he was

24  incarcerated. Indeed, plaintiff was the victim of a gang-directed assault by a cellmate. McGrath

25  testified that any inmate who is improperly validated as a gang member would be at risk of reprisal.

26

27

28       [26] As stated earlier, prior to trial, plaintiff dismissed the individual defendants and his claim for monetary damages. In addition, plaintiff's March 2008 discharge from CDCR confinement mooted any claim for institution-wide injunctive relief. Thus, the only injunctive relief plaintiff currently seeks is expungement of the validation, and removal of any validation-related documents from his prison files.

United States District Court
For the Northern District of California

1   There was also testimony about the communication network between prison gangs and street gangs, and

2   thus the fact that plaintiff is not currently incarcerated does not mean that he is not in danger.[27]

3        More importantly, the Court finds that the continued adverse impact on plaintiff's mental health

4   is a collateral consequence of plaintiff's gang validation and thus his claims for declaratory and

5   injunctive relief are not moot.  The entry of declaratory or injunctive relief in plaintiff's favor would be

6   inappropriate if it amounted to "nothing more than a declaration that he was wronged." *Green v.*

7   *Branson*, 108 F.3d 1296, 1299 (10th Cir. 1997).  However, plaintiff has proved that much more is at

8   stake here.  Plaintiff continues to suffer serious mental health problems as a result of the deprivation of

9   due process that he allegedly suffered at the hands of defendant.  Experts have testified that declaratory

10  and injunctive relief would have a significant mitigating impact on this continuing adverse impact to

11  plaintiff.  Therefore, the Court finds that plaintiff has demonstrated sufficient collateral consequences

12  as a result of defendant's actions, and that therefore the case is not moot.

13

14  **II.    Due Process**

15       Having determined that the case is not moot, the Court will now consider the merits of plaintiff's

16  due process claim.  The Due Process Clause of the Fourteenth Amendment to the United States

17  Constitution mandates that no State may "deprive any person of life, liberty, or property without due

18  process of law."  The "touchstone of due process is protection of the individual against arbitrary action

19  of the government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).  However, the Due Process Clause

20  protects only a limited range of interests; liberty interests protected by the Fourteenth Amendment arise

21  from two sources–the Due Process Clause itself and State law. *Meachum v. Fano*, 427 U.S. 215, 223-27

22  (1976).  The threshold inquiry in any due process case, therefore, is whether plaintiff has a protected

23  liberty interest.  If so, the Court must decide what process is constitutionally due to plaintiff, and

24  whether the plaintiff was deprived of his liberty interest without due process of law. *See Zimmerlee v.*

25  *Keeney*, 831 F.2d 183, 186 (9th Cir. 1987).

26  _____

27       [27]  Indeed, the Court notes that CDCR has consistently taken the position, in order to justify
extreme confidentiality restrictions in discovery and at trial, that prison gang retaliatory violence is
28  pervasive and not confined to the prison walls.  Specifically, CDCR strenuously argued that confidential
informant identities – even from confidential information dating back 10 and 17 years – must be kept
confidential in order to prevent retaliation against the informants or their families.

### A.   Protected Liberty Interest

Although the parties do not focus on this aspect of the due process analysis, the Court finds as a threshold matter that plaintiff had a protected liberty interest in remaining free from administrative segregation.  Changes to an inmate's confinement conditions may amount to a deprivation of a constitutionally protected liberty interest, provided that the liberty interest in question is one of real substance. *Sandin v. Conner*, 515 U.S. 472, 477-87 (1995).  The relevant inquiry under *Sandin* is thus whether administrative segregation at DVI and Pelican Bay's SHU "impose[d] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 484).

In *Wilkinson*, the Supreme Court held that indefinite retention in an Ohio prison's "supermax" facility, where inmates are generally not eligible for parole, imposes an "atypical and significant hardship within the correctional context." *Wilkinson*, 545 U.S. at 223-25.  The *Wilkinson* court attributed significant weight to the facts that inmates were not eligible for parole, and that "[u]nlike the 30-day placement in *Sandin*, placement at [Ohio's supermax facility] is indefinite." *Wilkinson*, 545 U.S. at 224.  Administrative segregation for gang affiliates Pelican Bay's SHU is similar.  It is undisputed that the SHU is designed to segregate a prisoner on a long-term basis, and here plaintiff's placement in SHU was indefinite.  As the *Wilkinson* court noted, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.  It follows that [plaintiff has] a liberty interest in avoiding assignment to [the SHU]." *Wilkinson*, 545 U.S. at 224.  Therefore, the Court finds that plaintiff had a protected liberty interest in avoiding confinement in administrative segregation.

### B.   Process Due

Having found that plaintiff had a protected liberty interest in remaining in the general prison population, the Court must now determine what process was constitutionally due when defendant placed and retained plaintiff in administrative segregation and whether that process was provided here. *See Madrid*, 889 F. Supp. at 1271.  The nature of due process "negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union, Local*

*473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961).  Particularly in the prison setting, administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  In identifying the procedural and substantive safeguards required by due process in the prison context, the Court recognizes the "legitimate institutional needs of assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation."  *Superintendent, Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 454-55 (1985).

In determining what process is due to plaintiff, the Court considers three distinct factors: the private interest that is affected by the government action, the risk of erroneous deprivation of that interest through the procedures used, and the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Clearly, plaintiff has a substantial interest in remaining free from the harsh conditions imposed by administrative segregation and the SHU.  The State also has a substantial interest in swift administrative segregation of suspected gang members.  "The State's first obligation must be to ensure the safety of the guards and prison personnel, the public, and the prisoners themselves." *Wilkinson*, 545 U.S. at 227.  Prison gangs pose a serious threat to prison security: "[c]landestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls." *Id.* at 227.  Finally, the risk of erroneous deprivation is high, but may not be cured by more formality of procedure.  Because the decision to place an inmate in administrative segregation draws on the experience of prison administrators and the State's interest implicates the safety of prison personnel and other inmates, "informal, nonadversary procedures" are appropriate.  *Id.* at 229.

Moreover, the "quantum of process that is constitutionally due to segregated inmates depends upon whether the segregation is punitive or administrative in nature." *Stewart v. Alameida*, 418 F. Supp. 2d 1154, 1165 (N.D. Cal. 2006).  Administrative segregation occurs when prison officials segregate an inmate "to further the need of the prison," for example to protect an inmate's safety or to keep an inmate isolated pending classification or transfer.  *Taylor v. Koon*, 682 F. Supp. 475, 477 (D. Nev. 1988).

35

United States District Court
For the Northern District of California

1   Administrative segregation does not necessarily brand an inmate with the stigma of wrongdoing. *Hewitt*

2   *v. Helms*, 459 U.S. 460, 468 (1983). Disciplinary detention, in contrast, is used to punish inmates. *Id.*

3   The procedural requirements that attach to administrative segregation are far less stringent than those

4   that are required in a disciplinary proceeding. *Hewitt*, 459 U.S. at 473-76; *Farr v. Blodgett*, 810 F.

5   Supp. 1485, 1496 (E. D. Wa. 1993). Thus, the procedural requirements that attach when prison officials

6   segregate inmates on the basis of gang affiliation are lower than those that attach when inmates are

7   segregated for disciplinary reasons.

8

9                    **1.    Validation as Gang Member and Initial Transfer to Administrative**
                            **Segregation (DVI Ad-Seg)**
10

11          Many courts have considered the balance of the *Mathews* factors and analyzed the process due

12   to inmates in connection with transfer to administrative segregation. The Supreme Court has held that

13   the level of process due to inmates before being transferred to administrative segregation includes some

14   notice of the charges against the inmate, and an opportunity to be heard. *Hewitt*, 459 U.S. at 473-76.[28]

15   In *Toussaint v. McCarthy* the Ninth Circuit clarified this standard and held that when prison officials

16   *initially* decide to place an inmate in administrative segregation, due process requires only the following

17   procedures: "[p]rison officials must hold an informal nonadversary hearing within a reasonable time

18   after the prisoner is segregated. The prison officials must inform the prisoner of the charges against the

19   prisoner or their reasons for considering segregation. Prison officials must allow the prisoner to present

20   his views." *Toussaint*, 801 F.2d 1080, 1100 (9th Cir. 1986), *abrogated in part on other grounds by*

21   *Sandin*, 515 U.S. 472). The *Toussaint* court found that due process in the administrative segregation

22   context does *not* require detailed written notice of charges, representation by counsel or a substitute

23   therefor, an opportunity to present witnesses, or a written description of the reasons for placing the

24   prisoner in administrative segregation. *Toussaint*, 801 F.2d at 1100-01.

25          To satisfy the constitutional requirement than an inmate be provided "an opportunity to be

26   heard," the inmate must have an opportunity to present his views to the official who decides whether

27   _____

28          [28] Although *Sandin v. Conner* abrogated "*Hewitt*'s methodology for establishing the liberty
     interest, [the case] remain[s] instructive for [its] discussion of the appropriate level of procedural
     safeguards." *Wilkinson*, 545 U.S. at 229.

United States District Court
For the Northern District of California

to transfer the inmate to administrative segregation.  *Hewitt*, 459 U.S. at 476; *Toussaint*, 801 F.2d at 1100, 1102 (due process requires more than "meaningless gestures").  "In the case of administrative segregation founded upon positive gang validation, the official charged with deciding whether to transfer or retain an inmate in administrative segregation is the IGI."[29]  *Stewart*, 418 F. Supp. 2d at 1165 (citing *Toussaint*, 926 F.2d at 803, and *Madrid*, 889 F. Supp. at 1276).  It is this official to whom plaintiff must be allowed to present his views.  *See Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990).  Thus, "prior to validation as a gang member, [an inmate is] entitled to an 'informal nonadversary hearing' with an IGI."  *Stewart*, 418 F. Supp. 2d at 1165.  Because the ICC "is predisposed to transfer any validated inmate to the SHU," an inmate's meeting with the IGI, who prepares the gang validation packet and forwards his determination that the prisoner is associated with a gang to the SSU, is the critical point.  *Madrid*, 889 F. Supp. at 1277; *see also Juarez v. Alameida*, No. 1:04-cv-05668, 2008 U.S. Dist. LEXIS 66083, at *16-17 (E.D. Cal. Aug. 4, 2008) ("Because validation itself is the critical decision in the process, Plaintiff was entitled to notice and an opportunity to be heard on the issue of his validation *prior to* his validation." (emphasis original)).    The inmate may present his views via written statement or by oral presentation if prison officials believe a written statement would not be effective.  *Hewitt*, 459 U.S. at 476.  "So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied."  *Hewitt*, 459 U.S. at 476.

**2.       Retention in Administration Segregation (Pelican Bay SHU)**

Administrative segregation "may not be used as a pretext for indefinite commitment of an inmate.  Prison officials must engage in some sort of periodic review of the confinement of such

---

[29]  Although the ICC is the "designated decision-maker" as to segregation, the actual decision to segregate is clearly made by the IGI.  *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990) (noting that the "the actual decision to segregate is made by the Criminal Activities Coordinator," which is now called the IGI).  Because the IGI is the critical decision-maker, an inmate is not entitled to the opportunity to present his views to the SSU agent, the agent who formally approves the gang validation.  *Madrid*, 889 F. Supp. at 449; *Stewart*, 418 F. Supp. 2d at 1167.

inmates." *Hewitt*, 459 U.S. at 477 n.9.[30]  The impact on an inmate's liberty interest is likely to be greater when he is administratively segregated for an indefinite period of time based upon gang membership than when he is confined to segregation for a definite and short period of time.  *See Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (noting that plaintiff was segregated for two years, and that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards") (quoting *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)).  Likewise, the need for prison administrators to act swiftly is significantly lessened when the inmate is already segregated.  *Id.*  Thus, the decision to confine an inmate to segregated housing indefinitely requires more process than does the initial decision to place the inmate there.  *Id.*  In deciding to retain an inmate indefinitely in administrative segregation, due process requires that the inmate be given periodic reviews of his confinement that amount to more than "meaningless gestures."  *Toussaint*, 801 F.2d at 1101-02.

Specifically, if prison officials want to retain an inmate in administrative segregation indefinitely based on gang validation, due process requires the following: (1) that the inmate be afforded the opportunity to present his views to the IGI prior to any decision to retain him in segregation for an indeterminate period, or for any period exceeding 30 days, based on positive gang validation; (2) the IGI must designate the prisoner as being a current active member of the prison gang prior to an ICC decision to retain the inmate in segregation for an indeterminate period, or for any period exceeding 30 days; and (3) the IGI must reevaluate the designation that the inmate is a member of a prison gang every 120 days.  *Madrid*, 889 F. Supp. at 1273; *see also Toussaint v. Rowland*, 711 F. Supp. 536, 541 (N.D. Cal. 1989).  Although an inmate is entitled to a hearing before the ICC prior to its decision to retain him in segregated housing based on his gang validation,  *Stewart*, 418 F. Supp. 2d at 1165, the requirement that an inmate be given periodic reviews is not satisfied simply because an inmate routinely appears before the ICC during his segregation; if the ICC officials consistently deny an inmate's requests for an opportunity to refute his gang validation, due process is not satisfied.  *See Guizar v. Woodford*, 282 Fed. Appx. 551, 553 (9th Cir. 2008).

---

[30]  As noted above, California regulations mandate that ICC may not retain an inmate in administrative segregation beyond 30 days without the approval of a CSR.  At least in the context of assignments to SHU for gang association, the CSR's approval "is routine."  *Madrid*, 889 F. Supp. at 1244.

**C.      Process Afforded to Plaintiff**

Having determined that defendant was constitutionally required to provide plaintiff with the process outlined above, the Court must now consider whether the procedures provided by defendant comported with this standard.

**1.      Initial Gang Validation and Placement in DVI Ad-Seg**

Prison officials initiated the gang validation of plaintiff in December 1992.  Plaintiff was not notified.  By May of 1993, officials had collected three pieces of evidence in support of plaintiff's validation.  Plaintiff paroled on May 14, 1993.  On May 18, 1993, the IGI completed its investigation and submitted plaintiff's gang validation package to SSU.  On July 2, 1993, SSU validated plaintiff as an associate of the Northern Structure prison gang.  All of this was done totally in secret from plaintiff. Plaintiff was not provided with notice that he was being validated for gang membership, nor was he provided with notice that he had been positively validated.  When he returned to prison for a parole violation in December 1995, he was immediately placed in administrative segregation due to his gang validation status.  (Ex. 14).

Plaintiff was not provided with a non-adversary hearing with the IGI prior to his gang validation, and therefore he was not provided with notice and a *meaningful* opportunity to be heard.  Indeed, plaintiff's appearances before the ICC between the time he was initially placed in DVI Ad-seg and the date on which he was transferred to Pelican Bay to serve his indefinite SHU term can hardly be characterized as meaningful.   To the contrary, ICC spent six months telling plaintiff they couldn't consider his gang status until his C-file arrived, although it provided no explanation for the delay.  Once the file did arrive, ICC told plaintiff that his chrono had not arrived, and thus they *still* could not consider his validation status.  Finally, once the Committee had both the C-file and the chrono, it immediately decided to transfer plaintiff to Pelican Bay SHU based on the IGI's validation.  At no point did prison officials allow plaintiff to refute the gang validation, for example by meeting with the IGI who had actually validated him, even though he continually requested that he be afforded the opportunity to do so.   Nor was plaintiff ever given the opportunity to present his views to either of the

1    IGIs who worked on his case.

2           This clearly does not satisfy even the minimal requirements of due process.  The "fundamental

3    requirement of due process is the opportunity to be heard *at a meaningful time* and *in a meaningful*

4    *manner*."  *Mathews*, 424 U.S. at 333 (emphasis added).  In the context of administrative segregation

5    based upon gang validation, this clearly requires an informal hearing with the IGI.  Because the ICC is

6    predisposed to administratively segregate any validated inmate, the inmate's meeting with the IGI is

7    critical.  *See Madrid*, 889 F. Supp. at 1277; *see also Hewitt*, 459 U.S. at 476 (due process requires that

8    an inmate be allowed to present his views to the official charged with deciding whether to confine him

9    to administrative segregation); *accord Toussaint*, 801 F.2d at 1100.  As the Ninth Circuit has noted, due

10   process "cannot be satisfied simply because it is undisputed that [plaintiff] routinely appeared before

11   the ICC during his segregation.  Under [plaintiff's] version of the facts . . . during these appearances the

12   ICC-defendants consistently denied [plaintiff's] multiple requests for an opportunity to refute the gang

13   validation."  *Guizar*, 282 Fed. Appx. at 553.

14          Indeed, testimony at trial underscored the critical importance of the initial meeting with the IGI

15   and conclusively established that due process cannot be afforded without it.  Because so many levels

16   of review after the validation decision rely on the IGI's findings and assume that the IGI did his job

17   correctly, it is crucial that the IGI fully investigate an inmate before endorsing his validation.  If the IGI

18   does not meet with the inmate before validating him, an integral part of the story, the inmate's side, is

19   missing from the IGI's version of the facts.

20          For example, the ICC does not reassess the credibility of or investigate the documents used to

21   validate an inmate.  Instead, the Committee simply notes whether the documents meet gang validation

22   requirements.  The committee does not do a substantive review of the documents because it is not their

23   job; rather, it is the original validating IGI's job.  Likewise, Officer Fielder, who conducted plaintiff's

24   inactive review, testified that he did not reevaluate or reassess the reliability of the source items used

25   for plaintiff's original validation because that was not part of his job.  (610:19-611:1).  Fielder explained

26   that the purpose of his investigation was not to provide plaintiff with an independent review of his

27   original validation.  Rather, he was just looking for gang activity within the last six years.  (610:19-

28   611:1).  Fielder simply assumed that the original validation had been proper.

United States District Court
For the Northern District of California

1      Nor was plaintiff able to obtain any substantive review of his validation through the appeal

2   process. Former Warden McGrath explained that appeals, at all levels, are procedural reviews. Officers

3   do not reevaluate the evidence, but simply look to see if all of the components are properly in place.

4   (708:14-709:3).   McGrath explained that in reviewing inmate appeals, he would not investigate

5   something like plaintiff's claim that he did not create the "gang" drawing.   Rather, McGrath would

6   assume the truth of whatever was written in the chrono.   (706:1-8).

7      McGrath conceded that there is essentially no recourse for an inmate who is mistakenly

8   validated.  The inmate cannot debrief, because in order to debrief you have to be an actual gang member.

9   The inmate can appeal, but, as explained above, appeals are only procedural reviews; officers reviewing

10   appeals do not make independent judgments of the evidence.   Moreover, the institutional expectation

11   is that every validated inmate appeals, and that all validated inmates claim that they are not in a gang.

12   McGrath testified that he has never met a gang members who said "I'm a gang member." Rather, "every

13   one of them denies it."  Given this extremely high number of appeals, it is unlikely that any inmate

14   could hope to get a meaningful review even if it weren't merely procedural.

15      Thus, given the fact that it is effectively impossible to undo a wrongful validation, it is absolutely

16   crucial that the IGI meet with the inmate *before* formally validating him.   Defendant makes much of the

17   fact that plaintiff was on parole when he was formally validated as a gang member, as though this

18   provides ample and reasonable explanation why plaintiff was never afforded an opportunity to meet with

19   the IGI.   It does not.   IGI Smith's investigation into plaintiff's gang involvement began at least in

20   December of 1992.  Plaintiff remained incarcerated until May 14, 1993.  Defendant has provided no

21   explanation for the fact that IGI Smith failed to meet with plaintiff during these six months, and there

22   does not appear to be any.  The simple fact is that plaintiff was not afforded an opportunity to meet with

23   the critical decision-maker in the validation process before the process was complete, and therefore

24   plaintiff was deprived of due process of law.

25

26          **2.      Retention in Administrative Segregation at Pelican Bay SHU**

27      On September 24, 1996, prison officials decided to transfer plaintiff to the Security Housing Unit

28   ("SHU") at Pelican Bay for indefinite administrative segregation.  Plaintiff remained in the SHU for the

United States District Court
For the Northern District of California

1  remainder of his sentence.  During plaintiff's confinement in the SHU, he regularly appeared before the

2  ICC and engaged in several inmate appeals.  Defendant argues that these procedures provided plaintiff

3  with sufficient due process, and that they cured any violation of plaintiff's due process rights that may

4  have occurred when he was initially validated as a gang member and placed in administrative

5  segregation.  The Court disagrees with both contentions.

6         It is of course settled that a "violation of procedural rights requires only a procedural correction,

7  not reinstatement of a substantive right to which the claimant may not be entitled on the merits."

8  *Raditch v. United States*, 929 F.2d 478, 481 (9th Cir. 1991).  But plaintiff was not provided with

9  sufficient meaningful periodic review of his SHU confinement to constitute even a procedural

10  correction.  Although he appeared regularly before the ICC, that evidence shows that those hearings

11  were largely perfunctory and generally lasted no more than five minutes.  Moreover, the purpose of the

12  ICC reviews was merely to verify that plaintiff's validation was procedurally proper.  The ICC reviews

13  provided no substantive review of the propriety of plaintiff's retention in administrative segregation.

14  Plaintiff was not afforded any kind of meeting with an IGI until1998, and even then the meeting was

15  in the context of his 602 inmate appeal.  As former Warden McGrath testified, such appeals involve only

16  procedural review.  But because plaintiff was denied the opportunity to present his views to the *original*

17  *validating* IGI, the critical decision-maker, before the IGI decided to validate him as a gang member,

18  the periodic procedural reviews of that decision were meaningless.  In order for periodic review to be

19  meaningful to plaintiff, it had to be substantive; in essence, it needed to make up for the fact that he was

20  never afforded an opportunity to meet with the IGI prior to his validation.  However, the evidence and

21  testimony at trial established that no one ever re-investigated or re-evaluated the validation evidence.

22  The Court therefore finds that plaintiff did not receive meaningful periodic reviews of his SHU

23  confinement and that his due process rights were violated.  The Court further concludes that because

24  the periodic reviews were not meaningful, those reviews did not cure the initial violation of plaintiff's

25  due process rights.

26

27         **3.      Evidence Used to Validate Inmate as Gang Member**

28  Due process also requires that when prison officials decide to deprive an inmate of the liberty

42

1   interest of remaining free from administrative segregation, they do so on the basis of "some evidence

2   on the record." *Cato v. Rushen*, 824 F.2d 703, 706 (9th Cir. 1987) (articulating the standard adopted

3   by the Supreme Court in *Hill*, 472 U.S. at 455). Under the *Hill* standard, the Court asks whether there

4   is "any evidence in the record that could support the conclusion" reached by prison officials. *Hill*, 472

5   U.S. at 455-56. Because prison officials may properly rely on their "experience and awareness of

6   general prison conditions" when making segregation decisions, *Toussaint*, 801 F.2d at 1105, the *Hill*

7   standard is minimally stringent. Nevertheless, there must be "some indicia of reliability of the

8   information" that prison officials use to place inmates in administrative segregation. *Cato*, 824 F.2d at

9   705.

10      While "due process does not require disclosure of the identity of any person providing

11   information leading to the placement of a prisoner in administrative segregation," *Toussaint*, 801 F.2d

12   at 1101, "the use of confidential information in segregation proceedings is still subject to a

13   determination as to its reliability." *Farr*, 810 F. Supp. at 1491. Even in the administrative segregation

14   context, confidential information must meet "certain standards for reliability." *Id.* at 1497.

15      After careful consideration of the testimony and evidence at trial, the Court concludes that the

16   evidence used to validate plaintiff as a Northern Structure affiliate does not meet the "some evidence"

17   standard because each item lacks some indicia of reliability. The Court emphasizes that if any single

18   piece of evidence was reliable, that would be sufficient to meet the "some evidence" standard,

19   notwithstanding the weaknesses of the other evidence. However, the problem here is that all of the

20   validating evidence suffered from reliability problems: the evidence was either uncorroborated, as with

21   the 1992 "laundry list" and the 1998 debriefing report claiming that plaintiff assaulted a cellmate, or

22   equivocal and marked with inconsistencies, as with the drawing and Romero's reports about the Merced

23   County Jail yard incident.

24

25                                  **a.    The drawing**

26      The Court finds that there are a number of problems with CDCR's reliance on the drawing as

27   evidence of plaintiff's prison gang affiliation. At trial the purported "gang symbols" were not visible

28   even to many of defendant's witnesses, all of whom testified about their extensive training in

43

investigating prison gangs and identifying prison gang symbols.  Almost nobody could identify the "Northern Star," and the two witnesses who could find it located it in different places on the drawing, and one witness only after being shown a highlighted version.  Further undermining the reliability of the drawing as evidence of prison gang affiliation is the equivocal nature of the Huelga bird and the number "14."  The evidence at trial established that the Huelga bird is a used by the United Farm Workers as their union symbol, and that it has become a symbol of Hispanic American culture.  Similarly, the number "14" refers to "N," the fourteenth letter of the alphabet, and in turn stands for "Norteno" or Northern California Hispanic.

The value of the drawing as a validation item is further called into question by the evidence demonstrating that plaintiff did not draw it.  As stated above, the Court is persuaded by the testimony at trial that plaintiff only admitted that the photocopied drawing was his, not that he created it, and that instead another inmate, Freddie Leyba, made the drawing.  Mr. Leyba testified that there is no Northern Star in the drawing, that he did not intend to put any hidden gang symbols in the drawing, and that the number "14" was intended to signify "Norteno."  Defendant contends that it is irrelevant whether plaintiff or another inmate created the drawing because what is important is the fact that plaintiff possessed the drawing.  This position is somewhat inconsistent with the importance attributed in the chrono to plaintiff purportedly "freely admitting" that he created the drawing.  Moreover, given the inscrutability of the symbols – as demonstrated by defendant's own witnesses at trial – the fact that plaintiff did not make the drawing is relevant; if plaintiff was not connected to the Northern Structure prison gang, he presumably would have as much difficulty, if not more, locating hidden gang symbols in the picture than the trained gang investigators.

Moreover, the Court is troubled by evidence suggesting that CDCR personnel may have confused the Leyba drawing confiscated from plaintiff's locker with the "Nuestra Raza" picture confiscated from validated Northern Structure inmate Juan Morales.  The Morales drawing was mistakenly placed in plaintiff's C-file, and contains the handwritten notation "See 128B dated 5/10/93" – the date of the chrono prepared for the Leyba drawing.  Unlike the Lebya drawing, in the Morales drawing the Huelga bird is clearly identifiable, and contains the obvious gang reference to "Nuestra Raza."

**b.      Officer Romero's Merced County Jail Incident Report**

The Court concludes that Officer Romero's April 13, 1993 incident report is problematic as prison gang validation evidence in many ways. As a threshold matter, the Court is troubled by the differences between the two versions of the report. Officer Romero testified that the contemporaneous handwritten report was accurate, and that when he wrote that report he recorded everything that he thought was significant to document regarding the incident. No explanation was provided as to why the contemporaneous handwritten report does not identify plaintiff as being one of the two main participants in the incident, while the typed report, made a year later, names plaintiff as one of the instigators.

In any event, under both versions of the report, the incident was brief and did not result in any violence or physical contact, and plaintiff's gang validation expert Dan Vasquez testified that this incident was too inconsequential to have any prison gang significance. Moreover, Officer Romero testified that he did not intend to indicate that plaintiff was affiliated with a prison gang, and indeed Romero wrote a letter to CDCR in 1998 to "clarify any misunderstandings" that CDCR might have as to whether Merced County Jail had any gang validation on plaintiff. (Ex. 49). Particularly when CDCR received Romero's 1998 letter, CDCR should have questioned the reliability of the April 13, 1993 typed report as a basis for plaintiff's gang validation.

The Court is also very troubled by the fact that IGI Smith mistakenly interpreted Romero's April 13, 1993 report as stating that plaintiff was affiliated with the Northern Structure. As noted above, Smith mistakenly read the "/" in that report that punctuated the descriptions of plaintiff and validated NS member Juan Morales, and assumed that the information about Morales pertained to plaintiff. Smith memorialized that factual error in the May 10, 1993 chrono, stating "On April 13, 1993 I received information from Officer R. Romero, of the Merced County Sheriffs Department, who identifies Inmate Lira H-36693 AKA "CHINO" *to be an associate of the NORTHERN STRUCTURE Prison Gang . . . ."* (Ex. 10). That chrono was part of the official validation package. Defendant contends that this error was inconsequential because what really matters is the fact that the incident report shows plaintiff associating with a validated Northern Structure member, Morales. However, on this record the Court cannot conclude that this error – which goes to the heart of the validation matter – did not infect the validation process.

45

**c.      1992 Confidential Inmate Debriefing Report**

The 1992 confidential debriefing report also does not satisfy the "some evidence" standard.  The report, which is dated September 25, 1992, does not mention plaintiff anywhere in its narrative portion.  Plaintiff's name appears only in the "laundry list" at the end of the report, where he is identified as a Category III Northern Structure member.  The evidence at trial established that there was never any investigation into or attempt to independently corroborate this information.  Thus, the record is devoid of any information explaining how plaintiff's name came to be included in the "laundry list."

However, there is evidence as to how these laundry lists are typically compiled.  Several CDCR personnel testified that all Northern Structure members are required to memorize lists of other member names and identifying information.  These lists, sometimes referred to as "filter lists," are passed around within the prison system among Northern Structure members.  The inherent unreliability of such lists, based entirely on hearsay, is obvious.  There is no way to determine when such a list was compiled, from what sources, or by whom.  The Ninth Circuit has recognized in a similar context that an inmate statement relayed to correctional officials by a confidential informant with no firsthand knowledge of the statement was insufficient to constitute "some evidence" supporting gang validation.  *See Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987).  Here, there was no independent assessment or corroboration of plaintiff's inclusion on the laundry list, and thus this piece of evidence is inherently unreliable.[31]

Defendant contends that the debriefing report is reliable because the debriefing inmate incriminated himself, and because the information contained in the report was independently shown to be true.  However, as Officer Hernandez testified, he did not give the debriefing inmate a *Miranda* warning (consistent with CDCR practice), and in reality the debriefing process involved no risk of self-incrimination.  *See Medina v. Gomez*, No. C 93-1774 THE, 1997 WL 488588, at *5 (N.D. Cal. Aug. 14,

---

[31]  The inherent unreliability of laundry list identifications is reflected by the fact that CDCR changed its regulations on acceptable validation evidence items in January 2006 pursuant to its settlement of *Castillo v. Alameida*, No. C 94-2847 (N.D. Cal. 1994).  Under the regulations as amended, laundry list identifications in debriefing reports are no longer acceptable.  Instead, debriefing reports must both name an inmate as gang-affiliated, and in addition "Staff shall articulate how the information specifically relates to the inmate's involvement with the gang as a member or associate.  The information may be used as a source of validation if the informant provides specific knowledge of how he/she knew the inmate to be involved with the gang as a member or associate."  15 Cal. Code Regs. § 3378 (c)(7)(H).  CDCR emphasizes the fact that these regulations as amended are only prospective in effect.  The Court recognizes that these amended regulations do not apply to plaintiff's validation.

United States District Court
For the Northern District of California

1   1997) ("existing procedural safeguards preclude the possibility that a debriefing interview will later be

2   used as a basis for a criminal proceeding and thus adequately serve the policy underlying the Fifth

3   Amendment").  As to the contention that the report was reliable because information provided by the

4   debriefing inmate had been proven to be true, none of the 13 incident reports related to plaintiff.  In

5   addition, 4 of the 13 involved the debriefing inmate himself, for matters upon which a CDCR written

6   report had been generated, thus calling into question the "independent" nature of this corroboration.

7   Further, 11 of the 13 incidents dated from 1981 and 1982, and thus were 10 years old at the time of the

8   debriefing.

9        Another troubling aspect of the report is that a different inmate named Lira was mentioned in

10  the narrative portion of the report.  This Lira, however, did *not* appear in the laundry list at the end of

11  the report.  Because sometimes the informant simply provides the names for the laundry list and the

12  debriefing officer fills in the other information (such as CDC number), it is possible that the informant

13  might have been referring to the *other* Lira when naming names for the laundry list, and that when the

14  debriefing officer went to fill in the details, he looked up the name "Lira" and wrote down plaintiff's

15  CDC number by mistake.[32]  Because of these serious problems, the Court finds that this validation item

16  therefore did not meet even *Hill*'s minimally stringent "some evidence" standard.

17

18                     **d.    1998 Confidential Inmate Debriefing Report**

19       The final piece of evidence is the April 1, 1998 confidential inmate debriefing report, which was

20  used to continue plaintiff's validation on active status.  The report includes several accounts of gang

21  activity by plaintiff, the most serious of which is the account of plaintiff assaulting and "beating" a new

22  cellmate at the direction of a non-validated gang member.  However, the evidence at trial established

23  that CDCR's own records do not contain any record of such a beating.  Plaintiff's housing logs showed

24  that he had two cellmates during the time period possibly covered by the debriefing report: Anthony

25  Montoya and Anthony Ramirez.  As discussed above, the only "fight" between plaintiff and a cellmate

26  _____

27       [32] The Court also finds it notable that in the laundry list, plaintiff is identified as "CAT III."  As
     defendant's gang expert Marquez testified, Category III signifies a position of highest rank or leadership
28   within the Northern Structure.  This designation of plaintiff as a high ranking Northern Structure
     member is inconsistent with his validation as a Northern Structure associate, and was unexplained at
     trial.

1    occurred on October 7, 1997 between plaintiff and Anthony Ramirez. That incident was investigated,

2    and the disciplinary charges were dropped, with findings that there was no evidence of physical contact

3    between plaintiff and Ramirez. In the face of this evidence, defendant contends that the assault

4    described in the debriefing report was undetected. However, this is pure speculation on the part of

5    CDCR, and the evidence in the record is to the contrary. Moreover, the evidence at trial established that

6    no investigation was conducted as to the cellmate assault allegation. If CDCR staff had investigated this

7    allegation, they would have located the dismissed disciplinary charge regarding the incident between

8    plaintiff and Ramirez, which seriously calls into question the reliability of the debriefing report.

9           In sum, none of the evidence used to validate plaintiff was meaningful or reliable, and thus does

10   not meet the "some evidence" standard. The record is riddled with unexplained inconsistencies and

11   numerous indications that critical errors may have infected the validation process, such as Smith's

12   misreading of Romero's report as mistakenly identifying plaintiff as a Northern Structure associate.

13

14   **III.    Remedy**

15          **A.    Declaratory relief**

16          "Granting declaratory relief is committed to the sound discretion of the trial court." *Bilbrey v.*

17   *Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984). "Courts have generally recognized two criteria for

18   determining whether declaratory relief is appropriate; '(1) when the judgment will serve a useful

19   purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford

20   relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id.* (quoting

21   *McGraw-Edison Co. v. Preformed Line Prods. Co.*, 362 F.2d 339, 342 (9th Cir. 1966)). Here, there can

22   be no doubt that declaratory relief will "terminate and afford relief from the uncertainty, insecurity and

23   controversy" giving rise to this lawsuit. *See id.* Plaintiff has presented significant evidence that the

24   denial of due process he suffered at the hands of defendant has had a significant impact on his mental

25   and emotional health. Plaintiff's experts have testified that a declaration would have a significant

26   mitigating impact on plaintiff's condition. Therefore, the Court finds that declaratory relief is

27   appropriate here.

28

**B.      Expungement**

Because plaintiff's due process rights were violated when he was validated as a gang member without notice and opportunity to present his views, expungement of the gang records is an appropriate remedy. *See Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1275 (9th Cir. 1998) ("Even if the continued storage, against plaintiffs' wishes, of intimate medical information that was allegedly taken from them by unconstitutional means does not *itself* constitute a violation of law, it is clearly an ongoing 'effect' of the allegedly unconstitutional and discriminatory testing, and expungement of the test results would be an appropriate remedy for the alleged violation."); *cf. Fendler v. U.S. Parole Comm'n*, 774 F.2d 975, 979 (9th Cir. 1985) ("Federal courts have the equitable power 'to order the expungement of Government records where necessary to vindicate rights secured by the Constitution.'" (quoting *Chastain v. Kelley*, 510 F.2d 1232, 1235 (D.C. Cir. 1975)).

Expungement is appropriate when "the maintenance of such records would be fundamentally unfair." *United States v. Sweeney*, 914 F.2d 1260, 1264 (9th Cir. 1990); *see also Burnsworth v. Gunderson*, 179 F.3d 771, 772, 775 (9th Cir. 1999) (expungement of disciplinary records proper where prison convicted inmate of escape attempt based on "no evidence whatsoever"). The fact that the records are "state records" does not "put them beyond federal control, even though the area is a sensitive one involving delicate policy considerations." *Wilson v. Webster*, 467 F.2d 1282, 1284 (9th Cir. 1972). Therefore, the Court finds that expungement of plaintiff's gang validation records is appropriate here.

**IT IS SO ORDERED.**

Dated: September 30, 2009                                    _____

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

49