```
Pages 1 - 16

                UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

           BEFORE THE HONORABLE SUSAN ILLSTON

ERNESTO LIRA,                          )
                                       )
          Plaintiff,                   )
                                       )
  VS.                                  )  NO. C 00-0905-SI
                                       )
MATTHEW CATE, SECRETARY OF THE         )
CDCR, IN HIS OFFICIAL CAPACITY,        )
                                       )  San Francisco, California
          Defendant.                   )  Friday
                                       )  January 15, 2010
_____)  9:22 a.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**       Chapman, Popick & White
                         650 California Street
                         19th Floor
                         San Francisco, CA  94108
                         (415) 352-3000
                   **BY: MARK A. WHITE**


**For Defendant:**       Office of the Attorney General
                         455 Golden Gate Avenue, Suite 11000
                         San Francisco, CA  94102-7004
                         (415) 703-5970
                         (415) 703-1234 (fax)
                   **BY: SCOTT J. FEUDALE**



**Reported By:    Lydia Zinn, CSR #9223, RPR**
                  **Official Reporter - U.S. District Court**

```
 1            THE CLERK:  Okay.  Calling Civil 00-905, Ernesto Lira
 2   versus the Director of Corrections.
 3            MR. FEUDALE:  Good morning, your Honor.
 4   Scott Feudale, on behalf of defendant, Matthew Cate.
 5            THE COURT:  Good morning.
 6            MR. WHITE:  Good morning, your Honor.  Mark White, on
 7   behalf of plaintiff, Ernesto Lira.
 8            THE COURT:  Good morning.
 9            So this is defendant's motion to stay the judgment
10   pending appeal.  And the reason I wanted you to come in today
11   is I -- of course, I issued the judgment, so I'm not at all
12   persuaded that it was wrong.  So I'm not persuaded that I
13   should stay it on account of its likelihood of being reversed,
14   but I wanted to inquire about your concerns about the other
15   administrative consequences to -- that you are concerned about
16   with respect to the expungement of Mr. Lira's -- of Mr. Lira's
17   status.
18            You say that there would be an obligation to
19   investigate and reinvestigate and -- and do some other things
20   with respect to other inmates who might have been validated on
21   the basis of Mr. Lira's validation, right?
22            MR. FEUDALE:  That's correct, your Honor.
23            THE COURT:  Now, these are administrative
24   regulations.  You view them as mandatory.  And therefore,
25   you're saying that's why this is going to cause you all kinds
```

```
 1  of problems, right?
 2          MR. FEUDALE:  That's correct.
 3          THE COURT:  So my question is:  can I provide any
 4  relief with respect to those things by order?
 5          MR. FEUDALE:  I mean, if your Honor were to maybe
 6  waive those requirements, maybe that's something we could look
 7  into.
 8          THE COURT:  Well, what I'm thinking is this.  I'm not
 9  inclined to stay any kind of relief as to Mr. Lira himself, but
10  could I -- could I grant your motion, only to the extent of
11  staying collateral consequences of the sort that you've
12  described?
13          MR. FEUDALE:  Again, your Honor, that's something I
14  haven't really researched as far as, you know, the Court's --
15  obviously, the Court has authority to waive state law.  And
16  maybe if there's an order to that effect, that particular part
17  wouldn't have to -- that particular administrative process
18  wouldn't have to be undertaken; but there is some concerns
19  about Mr. Lira's validation, in particular with respect to our
20  status on appeal, if I could just address that.  And that
21  really is -- you know, this evidence goes to the heart of our
22  appeal; especially the sufficiency of it.
23          And it's -- if the evidence itself is expunged, we're
24  concerned that it technically moots out any argument we have on
25  whether or not the evidence is sufficient.  If it no longer
```

1  exists, if this evidence has been expunged, indeed, there is no
2  longer any gang validation at issue.
3          Certainly, Mr. Lira's --
4          **THE COURT:**  That makes no sense to me at all, I have
5  to tell you.
6          This would just be an order saying it's not going to
7  be effective anymore, and it's out of his record.  So if the
8  Court of Appeals says I'm wrong, they'd just say, "Put it back
9  in."
10         **MR. FEUDALE:**  Maybe, your Honor, I need some
11 clarification.  My interpretation of the order is not merely to
12 remove it from the file, but to destroy the documents.  And if
13 documents are no longer there, there is no longer any
14 validation at issue.
15         If your Honor would have us remove them from the file
16 and keep them in a place that they couldn't be used, you know,
17 in an administrative setting.  And Mr. Lira's return to
18 prison -- that's a different matter.  So we are concerned about
19 that.
20         We also, of course, are concerned about public
21 interest if Mr. Lira ends up back in prison, for whatever
22 reason.
23         **THE COURT:**  That's what I'm concerned about, too, to
24 be honest with you.  If he winds up back in prison for any
25 reason, in my view, he was wrongly validated.  And he ought not

1  be put back in the SHU.

2              That's exactly what I'm worried about.

3              So that's why I'm willing to work with you in any way
4  I can to avoid the collateral consequences, if you feel like
5  that's a lot of administrative work, and that ought not be
6  undertaken at this point; but let's say something bad happens,
7  and Mr. Lira's back in the system.  I don't think it's right
8  that he be in the system the way he was before, until the Court
9  of Appeals says I'm wrong.

10             **MR. FEUDALE:**  Well, and I can understand that,
11 your Honor.

12             I think our concern is -- is if your Honor is
13 incorrect, and Mr. Lira indeed is a gang member, and a gang
14 affiliation's -- his return to prison without this record --
15 he'll be in the general population, interacting with inmates.
16 And he could engage in gang activity recruitment, targeted
17 assaults, drug trafficking, whatever.  And there wouldn't be
18 that administrative process looking over him, because there's
19 nothing there.  There's no record there of his gang activity.

20             So my client is concerned for inmate safety as well
21 as staff safety, in case the Court is incorrect in its finding.
22 So that's another large concern for us.

23             **THE COURT:**  Well, that one -- if that were all that
24 motion was based on, I would simply deny the motion, but I was
25 concerned about the collateral issues, if there's a lot of work

1  and activity that needs to be done collaterally that you feel
2  should best be postponed until after the case is over.
3           Do you know, as a practical matter, how much we're
4  talking about with respect to Mr. Lira's validation, and other
5  inmates?
6           **MR. FEUDALE:**  I don't have exact numbers, your Honor,
7  but I have been told by one who signed the declaration this
8  could potentially possibly be in the hundreds of inmates.  I
9  mean, they don't know exactly.  There's no database to say
10 Mr. Lira was linked with this many inmates.  So we would have
11 to go through all these validations to find out which inmates
12 were linked to Mr. Lira through some form of association, and
13 then revisit those validations, because that direct link is
14 required under state law post 2006.  So there could be a lot
15 of -- a lot of inmates' validations at stake.  It's obviously a
16 big burden on taxpayers to have state administrators go through
17 and do this process.  So if your Honor is inclined to at least
18 stay that portion of the order, we would appreciate that; but
19 for -- if I could just be heard on the legal issues,
20 your Honor.
21          **THE COURT:**  Sure.
22          **MR. FEUDALE:**  I do believe that there are some
23 serious legal issues raised here.  And I'd just like to address
24 them just briefly.
25          Principally, one has to do with mootness.  I know

1  this has been brought before the Court before.
2          **THE COURT:**  Many times, yeah.  And I've read your
3  papers.  It's brought up again here.
4          **MR. FEUDALE:**  And so I won't engage in extended
5  argument, but I do want to point the Court's attention to not
6  only the Ninth Circuit, but other Circuits have held in the
7  Court that an inmate's release from prison automatically moots
8  out any claims for declaratory and injunctive relief.
9          **THE COURT:**  You can see why I have distinguished
10 those cases and felt differently about it here, because we are
11 having exactly this discussion, because you've just spent the
12 morning telling me how important it is that, if and when he
13 goes back in, he be dealt with like a validated gang member.
14 That's really important to you.  That's a current problem that
15 you are articulating to me.
16         Well, he's entitled, in my view -- and if my order is
17 correct -- to have that taken out of his record and be behind
18 him.  So, you know, it's not as if he doesn't have a stake in
19 this.
20         **MR. FEUDALE:**  I do understand that, your Honor.  And
21 I don't mean to undercut Mr. Lira's interest in this, but
22 I'm -- you know, one of the -- there is is a balancing test the
23 Court must engage in.  Obviously, the Court must take into
24 consideration the hardships of the parties.
25         The other end of the scale is the legal issues

1  raised.  And I think that this appeal -- we're not just
2  appealing, you know, for the sake of appeal.  We're not just
3  appealing the factual findings of the Court, which, of course,
4  are reviewed for abuse of discretion; much lower standard.
5         We're dealing with issues -- legal issues which I
6  think are pivotal as to whether or not, you know, this case
7  should have been tried; whether or not the evidence -- the
8  standard of review was properly applied at trial.  And I think
9  that we do have a sufficient chance of prevailing on the
10 merits; that some of these are legal issues that the Court
11 should consider in whether issuing a stay.
12         Thank you, your Honor.
13         **THE COURT:**  Mr. White.
14         **MR. WHITE:**  I address briefly, in our opposition, the
15 question about likelihood of success on the appeal.  And, as
16 your Honor, I know this was a bench trial, so I am not inclined
17 to add any further comment on that front, on the question of
18 prejudice.
19         I think we agree with what we take to be the sense of
20 some of your Honor's and of this dialogue -- Socratic dialogue
21 a few minutes ago.
22         First thing I want to say is that this notion of a, I
23 guess, comprehensive inmate C file review program that's going
24 to involve thousands and thousands of C files of validated
25 inmates that have to be reviewed throughout all 33 prison

1  facilities in the entire system -- that's just completely
2  fantastical, your Honor.
3          We all heard evidence during the course of the trial
4  that CDCR has its own office, by various titles over the
5  years -- it's currently, I think, the SSU -- that's set up
6  specifically for the purpose of maintaining an organized
7  archive of gang evidence and information specific to each
8  inmate.  Certainly each inmate that has been validated once
9  that occurs.
10         And that's maintained.  That's augmented if it has
11 additional evidence or information.  It develops over the years
12 of continued incarceration.
13         SSU has such a file for Mr. Lira, and has maintained
14 one since 1993.  It was produced at discovery.  The contents of
15 that SSU file mirror almost exactly the confidential portion of
16 Mr. Lira's C file, which also contains all of the validation
17 evidence regarding any association activity, criminal activity,
18 and anything gang related during the 17 years that have
19 transpired since Mr. Lira's wrongful validation.  We've all
20 seen that entire record.
21         There's absolutely nothing in it that shows any
22 association, let alone active association, confederacy in crime
23 or gang activity by Mr. Lira at all with anyone ever.  So they
24 already have localized in their own archive established for
25 this purpose the repository of information or documents to

1  which they would refer to find out if this review program needs
2  to be undertaken at all to any extent.  And we all know the
3  answer to that question:  it doesn't.
4           This cohort of hundreds or thousands of other
5  inmates, all of whose own validations are going to turn out to
6  be wrongful, and this whole system is going to collapse like
7  some house of cards once your expungement order goes through --
8  I find that fantastical as well.
9           So I just -- I just think that as a factual matter,
10 the concern about prejudice here, in terms of even having to
11 undertake this program as a threshold matter, just hasn't been
12 established.
13          As has also been pointed out, to the extent there's
14 any substance to this, it seems to me that CDCR has it within
15 its own administrative authority to simply decide to defer the
16 program, pending its appeal, if it's that certain of its own
17 appeal.  And if it's that certain of the enormous or staggering
18 administrative burden of this program, it should simply defer.
19 And I don't think it needs any guidance, let alone order from
20 this Court, to do that.
21          **THE COURT:**  Thank you.
22          **MR. FEUDALE:**  Just briefly, your Honor.
23          **THE COURT:**  Mm-hm.
24          **MR. FEUDALE:**  A couple of points that I think I need
25 to bring to the Court's attention.

1             One is I can concede that the SSU does maintain a
2  gang validation file as this inmate's individual C files, but
3  the files are -- you know, there's just a -- I haven't looked
4  personally, but from what I understand, there are just a bunch
5  of shelves feel files of inmates.  The same process would take
6  place, whether it takes place at a prison or SSU.  Each file is
7  individually pulled.  Look in there to see if there's anything
8  related to Mr. Lira.  And if there is, that inmate's validation
9  would have to be revisited.  The process is burdensome.  The
10 files are located in one unit, as opposed to different places
11 in the prison.
12            With respect to Mr. White's argument that Mr. Lira's
13 C file has the whole universe of gang activity, that's simply
14 not true.
15            It does have gang activity that was used against
16 Mr. Lira in the process of his validation.  There are
17 debriefing reports naming Mr. Lira which would put him there;
18 but if Mr. Lira is merely associating with an inmate on the
19 prison yard, that, in and of itself, for Mr. Lira, would not
20 necessarily be indicative of gang activity.  For that other
21 inmate who is associating with a validated gang member, it
22 would.  It would go in the other inmate's file.  It's evidence
23 showing he would was hanging out with a gang member.
24            That's why the whole universe of Mr. Lira's gang
25 activity is not necessarily controlled in that file.  If it was

1  something more substantive -- Mr. Lira engaging in an
2  assault -- that would be in Mr. Lira's C file.  The mere
3  association with another inmate would not necessarily be in a C
4  file with a gang record.
5          And finally, we're back to square one from a year
6  ago.  I apologize.  CDCR can simply defer this adminstrative
7  program.  Simply untrue.  There's nothing; no authority
8  Mr. White has cited to that state regulations would simply be
9  disregarded by CDCR officials.  They are mandatory.  While they
10 were not mandatory on this Court, they were mandatory on
11 officials.
12         **THE COURT:**  Let me tell you what my plan is, because
13 I take the point -- that last one -- that the rules say what
14 you're supposed to do, so you presumably can't just decide not
15 to follow them.  And I think that's a good thing.  We have
16 rules for reasons, and I'm glad they're there.
17         I'm going to deny your request and stay, but I am
18 going to observe that it seems like it would be appropriate in
19 this case to defer the administrative activities that you're
20 concerned about until the decision has been reviewed on appeal,
21 and either affirmed or reversed or whatever.  I am not going
22 to -- I'm just going to observe that to you right now.
23         If you feel like it would be useful for me to issue
24 any kind of a supplemental order that formalized that or that,
25 you know, gave some kind of specific leave to defer those

```
 1  processes, I'll be happy to sign it.
 2           I'm not going to draft of craft it.  I'll let you
 3  think about how you'd like it to read.  If you want something
 4  like that, I will do that.
 5           MR. FEUDALE:  You'd like me to prepare a proposed
 6  order, your Honor?
 7           THE COURT:  I think that would be better --
 8           MR. FEUDALE:  Sure.
 9           THE COURT:  -- because you can figure out what it is
10  you would like done.  You know, I'm always concerned about
11  federal courts coming in and meat-axing the state system on
12  what it's supposed to do.  I don't mean to be doing that, but
13  if you would it -- it would give you some kind of benefit or
14  comfort in that respect I'd be happy to sign something like
15  that fie.
16           MR. FEUDALE:  I would appreciate that, your Honor.
17  I'll draft one up.
18           MR. WHITE:  Could I read whatever's been drafted?
19           THE COURT:  Yeah.  Show it to Counsel, and let me see
20  it.
21           MR. FEUDALE:  Of course, your Honor.
22           One quick question with respect to expungement versus
23  actually destruction of the gang records.
24           Is that something your Honor would address?  I mean,
25  is there something I could put into the order where we keep it,
```

1  so it will not be used in any way against Mr. Lira when he
2  comes -- if he ever comes back to prison, but that we do have
3  the records in case this Court is overturned on appeal?  Does
4  that make sense?
5             **THE COURT:**  Yes.  I hear what you're saying.  I guess
6  I'm kind of surprised.  I would have no -- and I'll ask
7  Mr. White what his thoughts are.  I have no problem if you want
8  to take all of that material that I've ordered be expunged, and
9  put it in a manila envelope, and seal it up, and keep it,
10 pending later disposition by the Court of Appeals.  I've got no
11 problem with that.
12            Do you see a problem with that, Mr. White?  I mean,
13 those records are everywhere.  They're all through this record.
14 They're in the court file.
15            **MR. WHITE:**  Well, they're in the court file.  I
16 basically don't think that's a concern.
17            If the -- if your Honor proceeds with an expungement
18 order, if CDCR proceeds with the appeal and succeeds on
19 appeal --
20            **THE COURT:**  Uh-huh.
21            **MR. WHITE:**  -- then it seems to me that CDCR should
22 have the opportunity to "unexpunge" --
23            **THE COURT:**  Right.
24            **MR. WHITE:**  -- if that can be a word -- the
25 validation.

1      **THE COURT:**  Right.

2      **MR. WHITE:**  If it would make it logistically more
3 feasible to do that, addressing this contingency by taking the
4 validation records in documentary form as they exist in that
5 form, hermetically seal them in some mayonnaise jar, bury that
6 in the backyard of the headquarters of the CDCR, that's fine
7 with us.

8      **THE COURT:**  Now, Mr. White, I think we said more or
9 less the same thing, although his was a more colorful way of
10 saying it.

11      **MR. FEUDALE:**  As always.

12      **THE COURT:**  But I didn't mean the expungement to make
13 it disappear, but -- so certainly as long as it's not in his
14 file, operating on his life.

15      **MR. FEUDALE:**  Sure.  And if your Honor's okay with
16 that, I'll put that in the proposed order so that our clients
17 know exactly --

18      **THE COURT:**  I don't think you need to put the
19 mayonnaise jar into the order.

20      **MR. FEUDALE:**  I probably won't do that, your Honor.

21      **THE COURT:**  Okay.

22      **MR. WHITE:**  And just so we're clarifying the
23 clarifications here.  The expungement order will continue,
24 though, to direct that to the extent that the validation
25 records exist electronically, and there are references to

1  databases, and they maintain databases in electronic form, the
2  expungement, to my understanding, is going to proceed in an
3  unqualified way.
4          **THE COURT:**  That makes sense to me.  That's right.
5  And then if you need to reinstate, you can just read them back
6  in.
7          **MR. FEUDALE:**  That makes sense.
8          **THE COURT:**  All right.  Thank you.
9          **MR. FEUDALE:**  Thank you, your Honor.
10         (At 9:42 a.m. the proceedings were adjourned.)
11                          -  -  -  -

*Lydia Zinn, CSR, RPR*
*Official Reporter - U.S. District Court*
*(415) 531-6587*

## **CERTIFICATE OF REPORTER**

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C. 00-0905-SI, Ernesto Lira v. Director of Corrections, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Friday, February 26, 2010